226 P.3d 441

**STATE of Hawai'i, Respondent/Plaintiff–Appellee**

**v.**

**Angela STENGER, Petitioner/Defendant–Appellant.**

**No. 27511.**

Supreme Court of Hawai'i.

March 4, 2010.

Karen Nakasone, Deputy Public Defender (Taryn Tomasa, Deputy Public Defender, on the briefs and application) for petitioner/defendant-appellant.

Lawrence A. Goya, Deputy Attorney General for respondent/plaintiff-appellee.

ACOBA, and DUFFY, JJ., and Circuit Judge KIM assigned due to a vacancy; with substitute Justice KIM concurring separately; and MOON, C.J., Dissenting; and NAKAYAMA, J., dissenting, with whom MOON, C.J., Joins.

Opinion of the Court by ACOBA, J.

We hold that (1) Petitioner/Defendant–Appellant Angela Stenger (Petitioner) was entitled to a mistake of fact instruction under Hawai'i Revised Statutes (HRS) § 702–218 (1993) [1]; (2) based on that holding, it would be inappropriate for the circuit court of the first circuit (the court) [2] to also give a claim of right instruction pursuant to HRS § 708–834(1) (Supp.2002) [3]; (3) under the circumstances of this case, first-degree theft by deception under HRS §§ 708–830(2) and 708–830.5(1)(a) (1993) [4] is a continuing of-

1. HRS § 702–218 provides that

   [i]n any prosecution for an offense, it is a defense that the accused engaged in the prohibited conduct under ignorance or mistake of fact if:

   (1) The ignorance or mistake negatives the state of mind required to establish an element of the offense; or

   (2) The law defining the offense or a law related thereto provides that the state of mind established by such ignorance or mistake constitutes a defense.

2. The Honorable Richard K. Perkins presided.

3. HRS § 708–834(1) states that

   [i]t is a defense to a prosecution for theft that the defendant:

   (a) Was unaware that the property or service was that of another; or

   (b) *Believed that the defendant was entitled to the property or services under a claim of right* or that the defendant was authorized, by the owner or by law, to obtain or exert control as the defendant did.

   (Emphasis added.)

4. HRS § 708–830(2) provides in relevant part that "[a] person commits theft if the person ... obtains, or exerts control over, the property of another *by deception* with intent to deprive the other of the property." (Emphasis added.) HRS § 708–830.5(1)(a) states that "[a] person com-

fense, and thus, the court was right in rejecting Petitioner's request for a specific unanimity instruction as to the charged offense of Theft in the First Degree; (4) however, Petitioner was entitled to a unanimity instruction as to the included offense of Theft in the Second Degree under HRS § 708-831 (Supp. 2002)[5]; and (5) Petitioner was entitled to jury instructions on the lesser included offenses of Theft in the Third Degree under HRS § 708-832 (1993)[6]; and Theft in the Fourth Degree under HRS § 708-833 (1993)[7]; additionally, assuming Respondent/Plaintiff-Appellee State of Hawai'i (Respondent) presents its case in the same way, Petitioner will be entitled to such instructions upon remand. For those reasons, the judgment of the Intermediate Court of Appeals (ICA) filed on January 30, 2009, pursuant to its December 31, 2008 Summary Disposition Order (SDO),[8] *State v. Stenger*, No. 27511, 119 Hawai'i 336, 197 P.3d 788, 2008 WL 5413898 (App. Dec. 31, 2008), vacating the August 24, 2005 Judgment filed by the court, convicting Petitioner of first-degree theft by deception under HRS §§ 708-830(2) and 708-830.5(1)(a) (1993), is vacated in part, the court's judgment is vacated, and the case is remanded for a new trial consistent with this opinion.

This is the second application for writ of certiorari in this case. In the first application, Respondent[9] asked this court to review the ICA's January 30, 2009 judgment, on the ground that the ICA gravely erred in ruling that Petitioner was entitled to the claim-of-right defense instruction where she did not have sufficient interest in the welfare benefits. By a 3-2 vote this court rejected the application. *See State v. Stenger*, No. 27511, 2009 WL 2171562 (Haw. April 23, 2009) (Acoba, J., dissenting separately, and Kim, J., dissenting separately).

In the second application for writ of certiorari, filed by Petitioner on April 30, 2009 (Application), Petitioner seeks review of the ICA's judgment and SDO, on the basis that the ICA gravely erred in holding (1) "that the [court] did not err in refusing to give a specific unanimity instruction[,]" and (2) "that [Petitioner] was not entitled to a mistake of fact jury instruction."

## I.

In June 2002, Petitioner, due to a high-risk pregnancy, ceased her work as a substitute teacher with the Department of Education (DOE), and also for the Hawai'i Surf Academy (HSA), a business owned and operated by Petitioner. Petitioner thereafter applied for financial aid, medical coverage, and food stamps (public assistance), from the Department of Human Services (DHS). At the time she applied for aid, Petitioner had two children, Kaelin Himphill (Kaelin) and Keana Himphill (Keana).

On June 21, 2002, Terri Cambra (Cambra), an eligibility supervisor for DHS, interviewed Petitioner, and reviewed her applications to determine whether she was eligible for public

mits the offense of theft in the first degree if the person commits theft [o]f property or services, the value of which exceeds $20,000[.]" HRS § 708-800 (Supp.2002) provides, in relevant part that

> "[d]eception" occurs when a person knowingly:
> (1) Creates or confirms another's impression which is false and which the defendant does not believe to be true;
> (2) Fails to correct a false impression which the person previously has created or confirmed[.]

5. HRS § 708-831(1) provides, in relevant part, that

> [a] person commits the offense of theft in the second degree if the person commits theft: ....
> (b) Of property or services the value of which exceeds $300[.]

6. HRS § 708-832(1) states in pertinent part that

> [a] person commits the offense of theft in the third degree if the person commits theft:
> (a) Of property or services the value of which exceeds $100[.]

7. HRS § 708-833(1) provides that "[a] person commits the offense of theft in the fourth degree if the person commits theft of property or services of any value not in excess of $100."

8. The SDO was filed by Presiding Judge Daniel R. Foley, and Associate Judges Craig H. Nakamura and Alexa D.M. Fujise.

9. In that proceeding the State was actually the Petitioner, but for ease of reference, this opinion refers to the State as Respondent throughout, inasmuch as the State is the Respondent for purposes of the instant application.

assistance. Petitioner reported that she had a Bank of America account with $300, and an American Savings checking account. She received monthly child support of $570, and last worked for the DOE in June 2002.

Upon meeting with Petitioner, Cambra went over the responsibilities and penalties associated with receiving public assistance, which are listed on the application, including the penalties for providing false information, and the requirement that all changes be reported within ten days. Petitioner signed a statement on the application stating that her answers were true and correct, and that she understood the penalties for giving false information. At that time, Petitioner did not qualify for public assistance, because she exceeded the income limit.

On July 2, 2002, Petitioner reapplied for public assistance, and was found to be eligible.

On August 22, 2002, Petitioner gave birth to twins, Jadelyn and Jolene Stenger (the twins). In October of 2002, two sisters, Pearlinda Aea (Aea) and Sheila Ann Geiger (Geiger) [collectively, the sisters], began assisting Petitioner with the twins' care. According to Petitioner, the sisters cared for the twins a couple of days a week between October 2002 and May 2003. According to Aea, she cared for Jolene 16 days or more per month. According to Geiger, she cared for Jadelyn three to four days per week in October 2002, which escalated thereafter. Geiger claimed that after December 2002, Jadelyn did not stay overnight with Petitioner. The sisters were not paid for this service. On December 16, 2002, Petitioner informed her DHS public assistance case worker Lyn Cardenas (Cardenas) in writing that the sisters were watching the twins two to three days per week, and that Petitioner's mother occasionally watched Kaelin and Keana.

In January 2003, Petitioner sent Kaelin and Keana to live with their father in Oregon, and transferred custody of both children over to him. However, Petitioner claimed that she intended the arrangement to be only temporary. In January, Petitioner reported that Kaelin had moved out, but waited until April to report that Keana had moved out, because she had believed that Keana was to return in a few weeks.

In March 2003, Petitioner made efforts to return to work, and wrote a letter to Cardenas informing her that she started working, as she intended to begin substitute teaching. However, Petitioner had a difficult time finding child care, and, although she worked intermittently, she did not report the income because it was not "regular." Petitioner and Respondent stipulated that Petitioner received the following unreported wages as a substitute teacher during the time she was receiving public assistance:

| | |
|---|---|
| October 18, 2002: | $232.62 |
| March 20, 2003: | $359.40 |
| April 4, 2003: | $599.00 |
| April 17, 2003: | $119.80 |
| May 5, 2003: | $119.80 |
| May 20, 2003: | $239.60 |

In 2003, Petitioner's grandfather passed away, leaving Petitioner a check for $5,000, which Petitioner gave to her mother. Petitioner's mother placed a portion of the money in a trust account at Bank of Hawaii, which, upon her death, would go to Petitioner. Scott Takahashi (Takahashi), custodian of records for Bank of Hawaii, testified that a $5000 check payable to Petitioner was deposited into three different accounts, for which Petitioner was either the signatory or the beneficiary. According to Petitioner, she divided the $5000 into three accounts, depositing $1000 into the HSA account, $500 into her personal account, and $3,500 into the trust account. Petitioner never reported the $5000 to DHS.

Takahashi further testified that Petitioner opened a checking account for her business, HSA, on July 25, 2000, for which Petitioner was the sole authorized signer. The HSA account's July 2002 statement showed an opening balance of $3,090.21 and a closing balance of $191.48. Activity for July included a check payable to Petitioner for $285 from the State of Hawai'i Child Support Enforcement Agency (CSEA) and a money order for $200 also payable to Petitioner. Takahashi further testified that in September 2002, there were credit card deposits to that account for $2,532.63, and $1,950.00. There

was another credit card deposit to the HSA account in January 2003 for $747.

In May 2003, Petitioner informed Cardenas that she wanted to be removed from public assistance because she had started working more frequently and the twins were staying with the sisters full time.

A DHS Welfare Fraud Investigator, Terrence Miyasato (Miyasato), investigated Petitioner based on anonymous tips. Miyasato conducted interviews and obtained information about the HSA. Nina Vallejo (Vallejo), an eligibility worker with the State's Investigation Office, worked with Miyasato on Petitioner's case to determine the amount of overpayment. Vallejo determined that Petitioner's (1) income and assets from the HSA, (2) income from DOE, and (3) failure to report that her children were not living with her, disqualified Petitioner from receiving public assistance, and evaluated separately how each of those factors related to the financial, food stamp, and medical assistance that Petitioner received between July 2002 and May 2003. Vallejo considers household size, monthly income, financial resources, and income guidelines when determining whether an individual is eligible for public assistance. She testified that without the children in the house, Petitioner was not eligible for any financial assistance on their behalf, but Petitioner could still receive assistance if she qualified in her own right. Vallejo based her calculation of Petitioner's overpayment amount on Miyasato's report, trial testimony, and bank statements. According to Vallejo, Petitioner was overpaid $7,350.00 in financial assistance, $5,598.00 in food stamps, and $10,086.00 in medical, totaling $23,034.00. That amount was based on the assumption that the testimony and reports were true and Vallejo conceded that if any items were not true, the calculations would change.

II.

On July 27, 2004, Petitioner was charged by indictment with Theft in the First Degree in violation of HRS §§ 708–830(2) and 708–730.5(1)(a). At trial, the defense submitted a proposed unanimity instruction pursuant to *State v. Arceo,* 84 Hawai'i 1, 30, 928 P.2d 843, 872 (1996), and also an instruction on the defense of claim of right. With regard to the unanimity instruction, Petitioner argued that "[Petitioner's] position is [the jury] need[s] to be unanimous on which months she wrongfully obtained these benefits[.]" Respondent argued that a unanimity instruction was not appropriate because the offense constituted a continuing offense. In agreement with Respondent, the court denied Petitioner's request.

With regard to claim of right, defense counsel orally requested that the jury be instructed on claim of right pursuant to HRS § 708–834, because Petitioner " 'believed she was entitled to the benefits that she obtained and exerted control over[.]' " Respondent countered that "[Petitioner] did not 'meet the conditions precedent for a claim of right' " because there was testimony that Petitioner both withheld relevant information and provided false information in order to obtain the benefits. The court denied the request for a claim of right instruction.

The court, by agreement of both Petitioner and Respondent, provided instructions on Theft in the First Degree, and the included offense of Theft in the Second Degree.

III.

Following the trial, on June 7, 2005, the jury found Petitioner guilty of Theft in the First Degree.

On appeal, Petitioner

> assert[ed] that the [court] erred by: 1) refusing to give an instruction, as requested by [Petitioner], on the claim-of-right defense; 2) failing sua sponte to give a mistake-of-fact instruction; 3) giving instructions, to which [Petitioner] had agreed, which failed to properly instruct the jury on the material elements for first-degree theft; and 4) refusing to give a specific unanimity instruction as requested by [Petitioner].

*Stenger,* 2008 WL 5413898, at *1. The ICA held (1) "that the [court] erred in refusing to instruct the jury on the claim-of-right defense" because Petitioner "did not obtain the welfare benefits by deception" but "honestly believed she had complied with the reporting

requirements[,]" *id.* at *3 [10]; (2) "[Petitioner's] claims do not support a mistake-of-fact defense[,]" because "[t]he only 'mistake' claimed by [Petitioner] was that she did not believe she was required to report certain of the undisputed events[,]" and "a mistake concerning what was required to be reported was a mistake of law, not a mistake of fact[,]" *id.* at *4; (3) the court's instructions on the first-degree theft offense "were not prejudicially insufficient or erroneous[,]" *id.*; and (4) the court did not err by refusing to give a specific unanimity instruction, because "[i]n this case, the charged first-degree theft offense can be proven as a continuous offense[,]" and Respondent "treated [Petitioner's] charged theft offense as a continuous offense in its prosecution of [Petitioner,]" *id.* at *6.

Because the ICA "agree[d] that the [court] erred in denying [Petitioner's] request that the jury be instructed on the claim-of-right defense," it "vacate[d Petitioner's] conviction and remand[ed] for a new trial." *Id.* at *1.

IV.

Petitioner presents the following questions in her Application:

> 1. Whether the ICA gravely erred in holding that the [court] did not err in refusing to give a specific unanimity instruction.
>
> 2. Whether the ICA gravely erred in holding that [Petitioner] was not entitled to a mistake of fact jury instruction. [11]

Respondent did not file a memorandum in opposition.

V.

A.

As to her second question, Petitioner argues that "[t]he ICA's conclusion that [Petitioner's] testimony supported a mistake of law, rather than a mistake of fact, is wrong[,]" because "[Petitioner's] testimony as to the allegations of the DOE income, the HSA income, and Keana's absence from the household all supported a mistake of fact defense." Petitioner urges that Respondent had to prove that she acted "by deception, specifically, knowingly creating, confirming, or failing to correct a false impression[,]" (citing HRS §§ 708-800, 708-830(2), and 708-830.5), and that "[Petitioner's] testimony that she did not believe she had to report the changes relates directly to her mistake as to whether she created a false impression." Thus, Petitioner argues that if she "mistakenly believed that she did not need to report the changes, then she mistakenly believed that she did not create any false impressions[,] which is a material element[.]" Although Petitioner failed to request a mistake of fact instruction at trial, she maintains that "[t]he evidence adduced at trial supported the instruction and the [court's] failure to give [it] constituted substantial error that cannot be deemed harmless[,]" because, "[i]f the trier of fact believed that [Petitioner] was mistaken as to a single allegation ..., it would have afforded [Petitioner] a mitigating defense by reducing the class of the offense."

B.

Respondent counters that "the [court] did not commit plain error in failing to give the jury an instruction on the defense of mistake-of-fact where there was no credible evidence to warrant such an instruction." According to Respondent,

> [t]he conduct that led to [Petitioner's] conviction, and the conduct against which her mistake-of-fact claim must be judged, was [Petitioner's] use of deception to obtain welfare funds to which she was not entitled, by failing to report that: (1) her children were not living with her, (2) she received a $5,000.00 lump sum payment, (3) she received income from the DOE, and (4) she received income from HSA.

Respondent maintains that "[Petitioner's] rebuttal to [Respondent's] evidence that she intentionally withheld information about the children" consisted of the following:

> (1) the twins, Jadelyn and Jolene, were always living with her, (2) neither of her two older children ... were living with her

10. The ICA's disposition of the claim of right issue is discussed at length *infra*.

11. We address Petitioner's second question, regarding mistake of fact, first.

mother at any time, and (3) she did report Kaelin leaving the household, but did not report Keana moving out until sometime later because she believed Keana would return to her home in a few weeks.

In Respondent's view, "[n]one of these explanations related to any mistake made by [Petitioner,]" but simply represent a "denial that she misrepresented the custody status of [her] children[,]" or "another form of deception[.]"

As to Petitioner's failure to report income, Respondent argues that her "explanations" are not "mistakes," but "excuses." As to any potential "mistake" Petitioner may have made in failing to report income, Respondent urges that "[t]he significance of the relationship between a person's income to eligibility should not have been lost on [Petitioner] because her own application for welfare assistance was at first rejected ... due to her income exceeding the eligibility limit."

Respondent also points out that "the warnings in the applications that [Petitioner] signed and completed to become eligible for welfare were very explicit[,]" stating that the recipient must "report any changes in your household or family within 10 days of the time you learn of the change[,]" including "receipt of a lump sum payment[,]" and "receipt ... of money from any source." Respondent essentially argues that none of the evidence presented supports a conclusion that Petitioner was acting under a "mistaken belief," and thus, "[t]he [court] did not commit plain error in refusing to give a mistake-of-fact instruction under such facts."

VI.

A.

As to the first question, Petitioner argues that "a unanimity instruction was necessary because [Respondent] adduced evidence of multiple acts and one or more than one combination of those acts could constitute the charged crime." (Citing *State v. Jones,* 96 Hawai'i 161, 170, 29 P.3d 351, 360 (2001).) Petitioner points out that

[i]n "multiple act" cases, the defendant's constitutional right to a unanimous jury verdict guaranteed under [a]rticle I, [sections] 5 and 14 of the Hawai'i Constitution require that the jury be unanimous as to which act or incident constituted the crime[:]

In a multiple acts case, ... several acts are alleged and any one of them could constitute the crime charged. In these cases, the jury must be unanimous as to which act or incident constituted the crime. To ensure jury unanimity in multiple acts cases, we require that either the State elect the particular criminal act upon which it will rely for conviction, or that the trial court instruct the jury [sic] that all of them must agree that the same underlying criminal act has been proved beyond a reasonable doubt.

(Quoting *State v. Shinyama,* 101 Hawai'i 389, 399, 69 P.3d 517, 527 (2003).) According to Petitioner, "[i]n this case, a unanimity instruction was required because [Respondent] argued for criminal liability based on multiple acts[,]" and, therefore, "[w]ithout a unanimity instruction, it is impossible to know whether the jury was unanimous as to the conduct that constituted the crime." Petitioner asserts that the evidence was presented at trial such that "if the jury disbelieved even one of [Respondent's] allegations, the amount of the [total] calculation would vary." According to Petitioner, "a combination of various allegations or even a sole allegation would have been sufficient to sustain the conviction[,]" inasmuch as "it was [not] necessary for the jury to find *all* allegations true in order to find that the value exceeded $20,000." Thus, Petitioner argues that "it is impossible to determine whether the jury was unanimous on conduct[.]"

Petitioner concedes that unanimity instructions are not required where Respondent relies on one course of conduct. However, Petitioner maintains that "the problem here is that [Respondent] did not elect to submit to the jury that it had to find that all of the acts of deception of which it adduced evidence at trial occurred in order to convict."

B.

Respondent argues to the contrary that "the [court] correctly refused to give the jury

a unanimity instruction where the instant offense is a continuing offense." According to Respondent,

> [w]hat distinguishes conduct consisting of separate acts from a continuous course of conduct is (1) *whether the conduct involved falls within the definition of a continuous offense,* and (2) *whether the prosecution alleged, adduced evidence, and argued that the accused's conduct was a continuous course of conduct in the presentation of its case.*

(Citing *State v. Hironaka,* 99 Hawai'i 198, 207, 53 P.3d 806, 815 (2002).) (Emphases added.)

As to the first requirement, Respondent maintains that "the instant offense was a continuing offense[,]" because (1) under *State v. Martin,* 62 Haw. 364, 616 P.2d 193 (1980), "it is well established that a continuous offense can consist of a theft based on a series of acts involving welfare fraud[,]" and (2) "the statutory construct for theft offenses in this State is favorable to treating thefts as a continuous offense[,]" inasmuch as "[HRS § ]708–801(6) plainly states that, 'amounts involved in thefts committed pursuant to one scheme or course of conduct, ... may be aggregated in determining the class or grade of the offense.' "

As to the second requirement, Respondent avers that "the record is clear that the instant indictment charged [Petitioner's] conduct as a continuous offense[,]" stating that

> [b]eginning on or about [July 2, 2002] and continuing through to on or about [May 31, 2003], ... [Petitioner] did obtain and exert control over the property of [Respondent], the value of which exceeded $20,000.00, by deception, with intent to deprive [Respondent] of its property, thereby committing the offense of Theft in the First Degree in violation of [HRS §§ 708–830(2) and 708–830.5(1) ].

(Bold emphasis omitted.) Additionally, Respondent maintains that it argued the crime as a continuous offense in its closing argument, by stating that the "amounts of theft committed pursuant to one scheme or course of conduct can be aggregated ... in determining the class or grade of the offense[,]" and "you can add up all the different instances where she committed theft and coming [sic] up with a final total which will be the determination of what kind of theft occurred in this case[.]"

## VII.

### A.

The defense of mistake of fact is codified in HRS § 702–218, which, as stated *supra,* provides, in relevant part, that

> [i]n any prosecution for an offense, it is a defense that the accused engaged in the prohibited conduct under ignorance or mistake of fact if:
>
> (1) The ignorance or mistake negatives the state of mind required to establish an element of the offense[.]

The Commentary on HRS § 702–218 provides that

> [t]his section states the logical concomitant of the requirement that to establish each element of an offense a certain state of mind with respect thereto must be proven. Thus, *if a person is ignorant or mistaken as to a matter of fact or law, the person's ignorance or mistake will, in appropriate circumstances, prevent the person from having the requisite culpability with respect to the fact or law as it actually exists.* For example, a person who is mistaken (either reasonably, negligently, or recklessly) as to which one of a number of similar umbrellas on a rack is the person's and who takes another's umbrella should be afforded a defense to a charge of theft predicated on either intentionally or knowingly taking the property of another. Also, a person, mistaken as to the effect of a divorce decree erroneously purporting to sever the marital ties of his wife, who marries another woman should not be convicted of bigamy if bigamy requires knowledge by the defendant of the defendant's existing marital status. *A reckless mistake would afford a defense to a charge requiring intent or knowledge-but not to an offense which required only recklessness or negligence. Similarly, a negligent mistake would afford a defense to a charge predicated on intent, knowledge, or recklessness—but not to an offense based on negligence.*
>
> This section of the Code deals with ignorance or mistake of fact or law, but it is

not intended to deal with the limited problem of the defense afforded a person who engaged in conduct under the mistaken belief that the conduct itself was not legally prohibited. That problem is dealt with exclusively by § 702–220.

Previous Hawaii law recognized a defense based on ignorance or mistake of fact or law, but usually the law required that the ignorance or mistake be reasonable. The Code correlates the culpability required for commission of the offense with the culpability which will deprive ignorance or mistake of effect as a defense.

(Emphases added.) [12]

According to Petitioner, "[b]iased on the evidence adduced at trial, a juror could have found that [Petitioner] believed that her actions complied with the reporting requirements[,]" and, therefore, "[Petitioner's] mistaken belief would have negated the states of mind required to establish the offense." As noted by Petitioner, Respondent was required to prove that Petitioner committed theft "by knowingly creating, confirming or failing to correct a false impression." (Citing HRS § 708–800.) Petitioner's theory as to mistake of fact is essentially that, if she believed she was complying with the reporting requirements by virtue of the items she did report to DHS, then she could not have "knowingly" created or failed to correct a false impression.

B.

As this court stated in *State v. Locquiao*,

[p]ursuant to HRS § 702–204 (1993), "*a person is not guilty of an offense unless the person acted intentionally, knowingly, recklessly, or negligently, as the law specifies, with respect to each element of the offense.*" "The elements of an offense are such (1) conduct, (2) attendant circumstances, and (3) result of conduct" that are "specified by the definition of the offense" and that "negative a defense." *See* HRS § 702–205 (1993). *With respect to defenses that negate penal liability, the defendant has the initial burden to adduce "credible evidence of facts constituting the defenses,* unless those facts are supplied by the prosecution's witnesses." *See* Commentary to HRS § 701–115 (1993).... *[I]f the defendant raises a non-affirmative defense, the prosecution must prove beyond a reasonable doubt facts negating the defense.*

100 Hawai'i 195, 206, 58 P.3d 1242, 1253 (2002) (brackets and ellipsis omitted) (emphases added). In that case,

Locquiao's sole defense at trial was that he was unaware that the "glass material" recovered by [the police] was an "ice pipe" and that the "glass material" contained methamphetamine. That being so, *Locquiao was entitled to an instruction on the ignorance-or-mistake-of-fact defense, and the prosecution bore the burden of disproving the defense—it being an element of its case-in-chief-beyond a reasonable doubt.*

*Id.* (emphasis added).

In determining whether a separate mistake of fact instruction was required in addi-

12. Although the Commentary indicates that the defense of "mistake of law" might be available, the Supplemental Commentary on HRS § 702–218 clarifies that mistake of law is only available in very limited circumstances not prescribed in that section:

The Legislature in dealing with § 702–218 deleted a defense based on mistake of law. The Legislature said that it was "thereby avoiding a major dilemma with respect to enforcement of the provisions of this Code. The defenses of ignorance of the law afforded by §§ 702–218 and 220 would have been available, to a degree, under any given set of circumstances and as such would have constituted a major encumbrance to enforcement of the substance and spirit of the Code." *See* Conference Committee Report No. 2 (1972).

*Although the Legislature did not provide for a defense based on mistake of law, the State Supreme Court has recognized that, in some instances, there must exist, as a necessary corollary to the definition to certain offenses, a defense based on this type of mistake. See State v. Marley,* 54 Haw. 450, 476–477, 509 P.2d 1095, 1111–1112 (1973). The court cited § 702–220 of the Hawaii Penal Code as providing a defense to a state trespass prosecution in the case of honest and reasonable belief ("no matter how incorrect such a belief might be") that another law (American treaty law) afforded a defense to the trespass.

(Emphasis added.)

tion to the circuit court's instruction as to the requisite state of mind for the offense, this court considered the legislative intent of HRS § 702–218, explaining that

> [t]he Hawai'i legislature premised the enactment of HRS § 702–218 on the proposition that, "if a person is ignorant or mistaken as to a matter of fact, the person's ignorance or mistake will, in appropriate circumstances, prevent the person from having the requisite culpability with respect to the fact as it actually exists." *See* Commentary to HRS § 702–218 (1993). *Consequently, the legislature intended that a jury consider, separate and apart from the substantive elements, whether a defendant's mistaken belief should negate the requisite culpability for the charged offense.* That being the case, insofar as ignorance or mistake of fact is a statutory defense in Hawai'i, *we ... now hold that, where a defendant has adduced evidence at trial supporting an instruction on the statutory defense of ignorance or mistake of fact, the trial court must, at the defendant's request, separately instruct as to the defense,* notwithstanding that the trial court has also instructed regarding the state of mind requisite to the charged offense. We believe that to hold otherwise would render HRS § 702–218(1) nugatory.

*Id.* at 208, 58 P.3d at 1255 (emphases added) (ellipsis omitted).

Under *Locquiao,* a defendant is entitled to a separate mistake of fact instruction when the defendant presents evidence, "no matter how weak," that he or she acted under a mistake of fact that negated an element of the offense:

> This court has consistently held that *a defendant is entitled to an instruction on every defense or theory of defense having any support in the evidence, provided such evidence would support the consideration of that issue by the jury, no matter how weak, inconclusive, or unsatisfactory the evidence may be.* Moreover, *it is the trial judge's duty to insure that the jury instructions cogently explain the law applicable to the facts of the case* and that the jury has proper guidance in its consideration of the issues before it. Thus, on review, we must ascertain whether the jury instructions given by the circuit court, when read and considered as a whole, are prejudicially insufficient, erroneous, inconsistent, or misleading. *Erroneous instructions are presumptively harmful and are a ground for reversal unless the prosecution satisfies its burden of showing that the erroneous instructions were harmless beyond a reasonable doubt.*

*Id.* at 205–06, 58 P.3d at 1252–53 (emphases added) (ellipsis, quotation marks, brackets, and citations omitted).

Although, unlike the defendant in *Locquiao,* Petitioner in this case did not specifically request a mistake of fact instruction at trial,[13] the "harmless beyond a reasonable doubt" standard set forth in *Locquiao* applies. *See State v. Nichols,* 111 Hawai'i 327, 337, 141 P.3d 974, 984 (2006) (holding "that, ... in the case of erroneous jury instructions, [the plain error] standard of review is effectively merged with the [Hawai'i Rules of Penal Procedure] Rule 52(a) harmless error standard of review because it is the duty of the trial court to properly instruct the jury[,]" and, thus, "once instructional error is demonstrated, we will vacate, without regard to whether timely objection was made, if there is a reasonable possibility that the error contributed to the defendant's conviction, *i.e.,* that the erroneous jury instruction was not harmless beyond a reasonable doubt"). Thus, we must determine (1) whether Petitioner presented any evidence, "no matter how weak," that would have supported the jury's consideration of a mistake of fact defense and, if so, (2) whether the court's failure to instruct on mistake of fact was harmless beyond a reasonable doubt.

C.

1.

Petitioner's argument is essentially that, "if [she] mistakenly believed that she

13. Petitioner did request a claim of right instruction, which is a subspecies of mistake of fact, and, therefore, argues that that request should be construed liberally to encompass a request for mistake of fact.

did not need to report the changes," then she did not knowingly create any false impressions. Petitioner presents the following as examples of evidence presented in her trial testimony that could have supported a mistake of fact defense:

> During the trial, [Petitioner] claimed, both in a letter to Cardenas, and during her testimony[,] that the twins were living with her during the relevant time period. Similarly, [Petitioner] denied that Kaelin or Keana were living with her mother at anytime [sic]. [Her mother] also confirmed this fact. [Petitioner] provided timely notice that Kaelin moved out of her household and also explained that she did not report Keana had moved because she believed that Keana would return to her household in a "few weeks."
>
> With respect to the unreported income, [Petitioner] and Cardenas both testified that [Petitioner] had reported in writing that she "started working." [Petitioner] explained that she did not attach her DOE pay stubs because she was not working regularly. Similarly, [Petitioner] testified that she did not work at the HSA as it was "seasonal" and that she reported the business to DHS. Finally, [Petitioner] did not report the $5,000 check that was dated in April 2003, but submitted a written request in May 2003 that she be removed from public assistance.
>
> ....
>
> In this case, [ ] the evidence adduced at trial substantiated that in multiple instances, [Petitioner] reported her household changes to Cardenas. [Petitioner] also provided explanations regarding [Respondent's] accusations of later reporting, failure to report changes, and contradictory witness testimony.

Based on the foregoing, Petitioner argues that "[a] reasonable juror could have concluded that [Petitioner] believed that she reported her household changes and disclosed all material information as mandated."

The ICA rejected Petitioner's contention, stating that

> [Petitioner's] claims do not support a mistake-of-fact defense. The evidence presented by [Petitioner] did not show that she was mistaken about any material fact. Instead, *[Petitioner] either disputed the facts alleged by [Respondent] or conceded the alleged facts but provided an explanation as to why she did not believe she was required to report them.* The only "mistake" claimed by [Petitioner] was that she did not believe she was required to report certain of the undisputed events. *However, a mistake concerning what was required to be reported was a mistake of law, not a mistake of fact.*

*Stenger*, 2008 WL 5413898, at *4 (emphases added). However, in the course of "disput[ing] the facts ... or conced[ing] the alleged facts but provid[ing] an explanation as to why she did not believe she was required to report them[,]" Petitioner presented evidence that could have supported the conclusion that she mistakenly believed that she in fact provided all of the required information, which would have been a factual mistake, and not a mistake as to any statutory law.

Based on the evidence presented, Petitioner provided some basis for the jury to believe (1) that she was mistaken as to the reporting requirements, *i.e.*, that she believed the reporting she provided was sufficient to receive assistance, and/or (2) that Petitioner was mistaken as to certain factual matters regarding her personal situation which caused her to misreport, *i.e.*, that Keana had not in fact moved out of her home permanently. Although Respondent contends that Petitioner's explanations do not represent any mistake of fact, but are merely "excuses," that is a credibility issue for the jury.

2.

Hence, it cannot be concluded that the court's failure to instruct on the defense of mistake of fact was harmless beyond a reasonable doubt. Merely because the court provided an instruction as to the requisite state of mind for theft in the first degree by deception does not render the failure to instruct on mistake of fact harmless. Under the facts presented here, there is a reasonable possibility that the jury, if provided with a separate mistake of fact instruction, could have found that Petitioner believed she complied with the reporting requirements and,

thus, did not knowingly deceive DHS. Thus, the ICA gravely erred in concluding that Petitioner was not entitled to an instruction on the mistake of fact defense.

VIII.

A.

The defense of a claim of right is set forth in HRS § 708–834, which, as set forth above, states in relevant part that "[i]t is a defense to a prosecution for theft that the defendant[ ] .... [b]elieved that the defendant was entitled to the property or services under a claim of right[.]" The ICA "conclude[d] that the circuit court erred in refusing to instruct the jury on the claim-of-right defense pursuant to HRS § 708–834(1)(b)[,]" because Petitioner " 'believed that [she] was entitled to the property or services under a claim of right.' " *Stenger,* 2008 WL 5413898, at *3 (quoting HRS § 708–834(1)(b)) (brackets omitted). That conclusion was based on the ICA's belief that "[t]he HRS § 708–834(1)(b) version of the claim-of-right defense ... is broader than the [Model Penal Code (MPC) ] version." *Id.* In that connection, the ICA explained that,

> [u]nlike HRS § 708–834(1)(b), the [MPC] version of the claim-of-right defense requires a link between the defendant's conduct and his or her claim of right. The MPC provides that "[i]t is an affirmative defense to prosecution for theft that the actor: ... *acted* under an honest claim of right to the property or services involved or that he [or she] had a right to acquire or dispose of it as he [or she] did[.]" [MPC] § 223.1(3)(b) (1980) (emphasis added). [Petitioner] does not contend that she acted (failed to accurately disclose material information) because of a claim of right to welfare benefits. Instead, she asserts that she did not disclose the information that [Respondent] alleges she deceptively concealed because she did not believe or know she was required to report such information. *Because there was no link between [Petitioner's] claim of right and her alleged unlawful conduct, [Petitioner] would not have a claim-of-right defense under the MPC.*
>
> *The HRS § 708–834(1)(b) version of the claim-of-right defense, however, is broader than the MPC version. HRS § 708–834(1)(b) does not require that the defendant's claim of right prompted his or her conduct, but provides a defense to a theft charge if the defendant "[b]elieved that [he or she] was entitled to the property or services under a claim of right."* [Petitioner's] theory of defense was that she did not obtain the welfare benefits by deception because she honestly believed she had complied with the reporting requirements. [Petitioner] either disputed the information [Respondent] alleged she dishonestly concealed or contended that she did not believe or know she was required to report such information. In support of her defense, [Petitioner] introduced evidence that she had alerted the DHS to changes in her child care and employment situations, which she contended contradicted [Respondent's] allegations of deceptive concealment. We conclude that [Petitioner] adduced sufficient evidence to warrant an instruction on her claim-of-right defense.

*Id.* With all due respect, the ICA's discussion of the variation in wording between HRS § 708–834 and the MPC does not recount a material difference. Both statutes manifestly refer to the defendant's state of mind at the time he or she "acted," *i.e.,* "obtain[ed]" or "exert[ed] control over" the property at issue. *See* HRS § 708–830(2). Hence, both versions require a "link between [a defendant's] claim of right and [the] alleged unlawful conduct[,]" otherwise the defense could not negate the state of mind of "obtain[ing] ... property ... by deception." *See id.* The state of mind of deception is inextricably linked to the action of obtaining property and, accordingly, so must be any defense capable of negating that state of mind. Hence, the ICA's conclusion that "[b]ecause there was *no link between [Petitioner's] claim of right and her alleged unlawful conduct, [Petitioner] would not have a claim-of-right defense under the MPC[,]*" *Stenger,* 2008 WL 5413898, at *3 (emphasis added), applies under HRS § 708–834 as well. The ICA's conclusion that Petitioner should have had the benefit of a claim-of-right defense then, was based on an incorrect premise.

B.

First, assuming, *arguendo*, a claim of right instruction is necessary in this case, it is already subsumed within the mistake of fact defense. The Commentary on HRS § 708–834 recognizes that the claim of right defense is "probably unnecessary" when a mistake of fact instruction is given:

> *Both the defenses allowed under § 708–834(1) are probably unnecessary* in light of an informed reading of the substantive definitions of the various modes of theft. The existence of either condition (a) or (b) would relieve the actor of the culpability required to establish the offense: ... *a claim of right, assuming that it amounts to a belief that the actor is the true owner,* would not only indicate that the actor did not have the requisite mental state, *it would constitute a mistake of fact defense under § 702–218. The summary and restatement of this subsection is principally for purposes of clarity and emphasis.*

(Emphases added.) Thus, the Commentary confirms that claim of right is a particular type of mistake of fact that would be logically encompassed under a general mistake of fact instruction. A claim of right instruction, then, should only be given where the circumstances of the case require it "for purposes of clarity and emphasis." *Id.* Those circumstances are defined by the established meaning of claim of right, the Commentary on HRS § 708–834, and case law, all of which indicate that the instruction should be given only when the defendant expresses a belief in true ownership rights to specific identifiable property.

C.

Second, although Petitioner's "theory of defense [ ] that she did not obtain the welfare benefits by deception because she honestly believed she had complied with the reporting requirements[,]" *Stenger,* 2008 WL 5413898, at *3, warrants a general mistake of fact instruction, manifestly, she did not exercise such a belief "*under a claim of right.*" HRS § 708–834 (emphasis added). Petitioner argued at trial that she "believed 'she was entitled to the benefits that she obtained and exerted control over,' based on the evidence that [Petitioner] reported household changes to her caseworker." However, the statute requires not only a belief of entitlement, but that the defendant was so entitled "under a claim of right." *Id.* If a mere belief of entitlement was enough, the "claim of right" language would be rendered a nullity. Hence, the phrase "claim of right" must carry a meaning distinct from "entitle[ment]." *See County of Hawai'i v. C & J Coupe Family Ltd. P'ship,* 119 Hawai'i 352, 362, 198 P.3d 615, 625 (2008) (holding that "an interpretation of a statute must be rejected if it renders any part of the statutory language a nullity" (brackets, quotation marks, and citation omitted)).

1.

The term "claim of right" is not defined in the statute. *Black's Law Dictionary* states that a claim of right is "[a] criminal plea, usu[ally] to a theft charge, by a defendant asserting that the property was taken under the honest (but mistaken) belief that the defendant had a *superior right to the property.*" *Black's Law Dictionary* 266 (8th ed.2004) (emphasis added). In this case, Petitioner has not exhibited any belief that her "right" to the money received was somehow "superior" to that of Respondent's merely because she "reported household changes."

2.

The Commentary on HRS § 708–834 states that "a claim of right ... amounts to a *belief that the actor is the true owner[.]*" (Emphasis added.) The "true owner" requirement connotes that ownership of the property must *precede* the actor's attempt to "deprive" another of that property. Petitioner does not claim that she was attempting to "recover" or "reclaim" property over which she had "ownership" rights, as required by the statute and the case law. Petitioner, on the other hand, repeatedly claimed that her belief was "based on the evidence that [she] reported household changes to her caseworker." Such action may provide evidence of a mistake of fact, *i.e.,* that Petitioner believed she was in compliance with the reporting requirements. But, it is not evidence that Petitioner acted based on any pre-existing

belief that she had ownership rights in the benefits she received. Instead, receipt of the benefits was a direct result of what was reported by Petitioner. Thus, Petitioner was aware that benefits were conditioned on what she reported to the DHS, in contradistinction to a belief in "*true ownership*" that existed prior to the act of deprivation.

3.

In *State v. Brighter,* 62 Haw. 25, 30, 608 P.2d 855, 859 (1980) (per curiam), this court set forth that the claim must be to specific property, stating that

> "[i]t is vital to the defense, however, that the interest which the accused asserts under a claim of right *must be to specific property,* HRS [§ ]708–834(1)(b); *State v. Martin,* [15 Or.App. 498, 516 P.2d 753 (1973) ], and the interest claimed by him must be in complete derogation of the victim's rights in and to the property which is the subject of the alleged robbery, HRS [§ ]708–834(5)." [14]

(Emphasis added.) *See also State v. Brighter,* 63 Haw. 105, 107–08, 621 P.2d 381, 384 (1980) (per curiam) ("This court has held that where no bona fide claim of right is made to *specific property,* the claim of right defense established by HRS § 708–834 is not available to a defendant charged with theft or robbery." (Emphasis added.) (Footnote and citation omitted.)). In *Martin,* the case upon which *Brighter* relied, the defendant attempted to assert a claim of right defense to robbery, where he attempted to recover a debt from another by force. 516 P.2d at 753–54. The Oregon Court of Appeals rejected that defense, emphasizing that

> it is *important to distinguish between,* on the one hand, situations where a person simply uses self-help to recover a *specific chattel to which he has the right to immediate possession,* and, on the other hand, situations where a person attempts to collect a debt out of another's money, *with no pretense of ownership rights in the specific coins and bills.*

*Id.* at 755 (emphases added). That court further recognized "that intent to steal is absent when a person *retakes wrongfully held specific personal property to which he has the right to possession.*" *Id.* (citation omitted) (emphasis added). In this case, Petitioner has failed to show that the welfare benefits she claims were "specific property."

4.

A claim of right defense, then, must encompass (1) some form of *pre-existing ownership* or possession of (2) *specific* property. Here, Petitioner has not made any claim that she received the benefits in an effort to "retake[ ] wrongfully held specific personal property[,]" *id.,* from Respondent. It would defy reason to attribute to Petitioner a belief that Respondent "wrongfully held" the benefits prior to distributing them to Petitioner.

Other courts have similarly viewed a claim of right defense as encompassing pre-existing ownership of specific property, holding, like *Brighter* and *Martin,* that a general claim that a debt is owed is not sufficient for a claim of right. For example, in *State v. Winston,* 170 W.Va. 555, 295 S.E.2d 46, 50 (1982), the Supreme Court of West Virginia rejected a claim of right defense where the defendant "attempt[ed] to recover from the victim the $7750 debt that was claimed to be owed." It was deemed "important to note" that the previous cases where a claim of right defense had been allowed "involved the *recovery of specific property to which the owner claimed title.*" *Id.* (emphasis added). That court distinguished *Winston* from previous cases where a claim of right instruction had been given, stating that "[i]n the present case, we are not confronted with a defendant who has recovered *specific property* to which he has a *bona fide claim of ownership.*" *Id.* (emphases added).

Significantly, the *Winston* court cited to *Brighter,* 62 Haw. 25, 608 P.2d 855, recognizing that, in *Brighter,* this court "limit[ed] the claim of right recovery ... to the *recovery of specific property.*" *Id.* at 51 (emphasis add-

14. Subsection (5) has been renumbered to subsection (4) in the present version of the statute, but the wording remains identical.

ed); *see also Woodward v. State,* 855 P.2d 423, 427 (Alaska App.1993) (relying on *Brighter* in rejecting defendant's claim because he "was not attempting to *recover particular, identifiable property* " (emphasis added)). The *Winston* court ultimately rejected the claim of right defense, concluding that "this defense is not available where the defendant took money or other property, *to which he did not have a specific ownership claim,* in satisfaction of a debt." 295 S.E.2d at 51 (emphasis added). In explaining why debt recovery does not support a claim of right defense, that court stated that "[t]he most commonly expressed rationale for this rule arises from the fact that in the debt recovery situation *there is no identifiable property which is reclaimable[.]* " *Id.* at 50 (emphasis added).

California has adopted a similar rationale in its claim of right cases, "limiting [the defense] to the perpetrator who merely seeks to effect what he believes in good faith to be the *recovery of specific items of his own personal property.*" *People v. Waidla,* 22 Cal.4th 690, 94 Cal.Rptr.2d 396, 996 P.2d 46, 73 n. 12 (2000) (citation omitted) (emphasis added). In *People v. Tufunga,* 21 Cal.4th 935, 90 Cal.Rptr.2d 143, 987 P.2d 168, 181 (1999), the California Supreme Court allowed a claim of right defense in a debt collection situation because there was evidence that the two hundred dollars reclaimed by the defendant was *actually the same bills* he had just given to the victim. The *Tufunga* court required the instruction on claim of right because "if the jury, properly instructed, believed defendant's testimony, ... defendant's actions in *seeking to recover* from the victim ... what he believed in good faith was his *specific property* " would negate the requisite intent. *Id.* (first emphasis added and second emphasis in original). Petitioner has not argued any right to the "specific coins and bills," *Martin,* 516 P.2d at 755, that she received from the government, thereby failing to satisfy the requirement set forth in *Brighter* that the claim be to "specific property," 62 Haw. at 30, 608 P.2d at 859.

D.

1.

A claim of entitlement to welfare benefits from Respondent's coffers amounts to nothing more than a claim that "general money" is owed. Several cases have reaffirmed the proposition from *Martin* that a claim of right must be to "specific coins or bills." *State v. Ramsey,* 184 Or.App. 468, 56 P.3d 484, 487 (2002), permitted the claim of right defense in a debt collection case because the "defendant's theory was that he was *trying to recover the specific money* that [the victim] had improperly taken from him[,]" and thus, "was not using force to recover a debt; rather, he was *using force to recover specific property.*" [15] (Emphases added.) In *People v. Wooten,* 44 Cal.App.4th 1834, 1848–49, 52 Cal.Rptr.2d 765 (Cal.App. 2 Dist.1996), the California appellate court rejected the claim of right defense because there was insufficient evidence to support such a claim, and *it was already covered by mistake of fact.*[16] *People v. Rosen,* 11 Cal.2d 147, 78 P.2d 727,

15. *Ramsey* reaffirmed the distinction "between using force to collect a debt and using force to recover a specific chattel[,]" as set forth in *Martin,* 15 Or.App. 498, 516 P.2d 753, an earlier case by that same court. 56 P.3d at 487. In that case, there was sufficient evidence for the claim of right instruction only because the defendant sought "to recover the money that [the victim] had *wrongfully taken from him* ... which, in this case, *could mean the specific currency* he lost at the table[,]" and "[a]ccording to [the] defendant, he sought only to *retrieve his own money[.]* " *Id.* at 488 (emphases added). To the contrary, in this case, Petitioner cannot reasonably claim that she was seeking to "recover" or "retrieve" "specific money" that was "wrongfully" or "improperly" taken from her by Respondent, let alone that she believed she was seeking to recover "the specific currency" wrongfully taken from her by Respondent. Thus, *Ramsey* illustrates just how inapposite the claim of right defense is in this case.

16. *Wooten* similarly does not support a claim of right defense in this case because, in that case, the appellate court affirmed the trial court's refusal of the requested claim of right instruction. *See* 44 Cal.App.4th at 1848, 52 Cal.Rptr.2d 765. In *Wooten,* "[t]he trial court refused appellant's requested instructions on [the claim of right] defense because it found them duplicative of instructions on mistake of law and fact." *Id.* The appellate court found "no error" because "the trial court had no obligation to give an instruction on the claim of right defense because there was no substantial evidence to support such a defense." *Id.*

729 (1938), like *Ramsey,* requires that the defendant evince a belief that he or she took the property in an effort to recover *specific currency,* requiring that "the accused must intend in good faith *to retake his own property.*"[17] (Emphasis added.) In this case, it would be incongruous to say that Respondent obtained the benefits from Petitioner through illegal activity, and that she was thus attempting to "retrieve" or "retake" her "own money" or "own property" illegally held by Respondent. *See Rosen,* 78 P.2d at 729; *Ramsey,* 56 P.3d at 488. These cases confirm that claim of right cases are entirely inapposite to the case at bar. There appears to be no case in which claim of right is upheld as a defense to a charge of welfare benefits theft.

█ Under the rationale set forth in *Brighter,* 62 Haw. 25, 608 P.2d 855, and *Martin,* and affirmed by the foregoing cases, Petitioner cannot claim any "*ownership rights in the specific coins and bills*" distributed to her in the form of benefits. Property can only be "specific" where the defendant believes that the particular identifiable item seized is the same as that which was previously in the defendant's possession. *See Martin,* 516 P.2d at 755 (stating that a claim of right involves the use of "self-help to *recover a specific chattel* to which [a defendant] has the right to immediate possession" or "*retak[ing]* wrongfully held *specific personal property* to which [a defendant] has the right to possession" (emphases added)).

2.

Under Petitioner's seeming formulation of the claim of right defense, once the defendant has deprived another of certain property, that property somehow gains a "specific" character, regardless of the defendant's preexisting relationship to that specific item of property. However, that interpretation of *Brighter* eviscerates any specificity requirement and, in conflict with *Brighter,* invites a claim of right instruction in cases where a defendant exhibits belief in a *general* entitlement to *unspecified* property that only gains its so-called "specific" character *after* it is in the defendant's possession. To the contrary, *Brighter* and *Martin* require that, *prior to taking the property,* the defendant must believe that he or she is acting to "recover" or "retake" "specific property" once held or owned by the defendant. *Brighter,* 62 Haw. at 30, 608 P.2d at 859; *Martin,* 516 P.2d at 755.

Petitioner did not have any ownership rights in the *specific* money distributed to her by Respondent. As far as Petitioner was concerned, any "bills or coins" would have satisfied her claim for benefits, not the particular coins and bills given her by Respondent. Thus, Petitioner's claim is not one of "true ownership" in "specific personal property" as required under claim of right, but is merely a belief in entitlement to some undefined future benefit that was never in her possession at any point prior to the alleged theft. The giving of a claim of right instruction in this case would remove the distinction between that defense and mistake of fact, which was adopted by the penal code for the "purposes of clarity and emphasis." Commentary on HRS § 708-834.

E.

Based on the foregoing, the ICA gravely erred in "conclud[ing] that Petitioner ad-

17. In *Rosen,* "the defendant [sought] the recaption of money lost by him at an illegal game[.]" 78 P.2d at 728. The California Supreme Court's decision in that case was based largely on the fact that the activity through which the defendant lost the money was illegal and thus, "the intent to steal is lacking in such a case, for *the law recognizes no title or right to possession in the winner[,]*" and, due to the illegality of the enterprise, "the winner gains no title to the property at stake nor any right to possession thereof; and that the participants have no standing in a court of law or equity." *Id.* (emphasis added). The theory is that "where the winner obtains no valid title or right to possession of the money won ..., the loser cannot have a felonious intent in taking it." *Id.* at 729 (ellipsis in original) (citations omitted). That court further held that "in resisting the charge of robbery by a showing that the intention was the *recaption of money lost at an illegal game,* it is not incumbent upon the defendant to prove that the money reclaimed was the identical money won from him," but "*the accused must intend in good faith to retake his own property.*" *Id.* (emphases added). Thus, although the defendant was relieved from proving that the money he actually recovered was the same currency he lost, the claim of right defense nonetheless required that he believe in good faith that he was "*retak[ing] his own property.*" *Id.* (emphasis added).

duced sufficient evidence to warrant an instruction on her claim-of-right defense." *Stenger,* 2008 WL 5413898 at *3. Thus, despite this court's previous order rejecting certiorari on the issue of claim of right, a claim of right instruction is not appropriate on this record, and should not be given.

IX.

With respect to Petitioner's first question, in *Arceo,* this court "h[e]ld that the right of an accused to a unanimous verdict in a criminal prosecution, tried before a jury in a court of this state, is guaranteed by article I, sections 5 and 14 of the Hawai'i Constitution." [18] 84 Hawai'i at 30, 928 P.2d at 872. Relatedly, *Arceo* held that, because "a general verdict embodies in a single finding the conclusions by the jury upon all questions submitted to it, ... in criminal cases, this requirement of unanimity extends to all issues which are left to the jury." *Id.* (quotation marks, brackets, ellipsis, and citation omitted).

A.

Based on those precepts, in *Arceo,* the defendant argued that,

> given the [victim's] testimony that Arceo committed multiple acts of sexual penetration and sexual contact within the context of single counts charging each—that *either the prosecution was required to elect the specific acts upon which it was relying* in seeking convictions of the charged offenses *or the circuit court was required to give the jury a "specific unanimity" instruction as to each count.*

*Id.* (emphases added). This court agreed, thereby

> hold[ing] that when *separate and distinct culpable acts* are subsumed within a single count charging a sexual assault—*any one of which could support a conviction thereunder*—and the defendant is ultimately convicted by a jury of the charged offense, *the defendant's constitutional right to a unanimous verdict is violated unless one or both of the following occurs:* (1) at or before the close of its case-in-chief, *the prosecution is required to elect the specific act upon which it is relying to establish the "conduct" element of the charged offense; or (2) the trial court gives the jury a specific unanimity instruction, i.e., an instruction that advises the jury that all twelve of its members must agree that the same underlying criminal act has been proved beyond a reasonable doubt.*

*Id.* at 32–33, 928 P.2d at 874–75 (emphases added). This court's holding in *Arceo* was based in part on its conclusion that sexual assault, as it is defined by the HRS, is not a "continuous offense." *Id.* at 12, 928 P.2d at 854. *Arceo* noted that

> [t]his court has defined a "continuing offense" as
>
> > *a continuous, unlawful act or series of acts set on foot by a single impulse and operated by an unintermittent force, however long a time it may occupy,* or an offense which continues day by day, or a breach of the criminal law, not terminated by a single act or fact, but subsisting for a definite period and intended to cover or apply to successive similar obligations or occurrences.

*Id.* at 18, 928 P.2d at 860 (quoting *State v. Temple,* 65 Haw. 261, 267 n. 6, 650 P.2d 1358, 1362 n. 6 (1982)) (brackets omitted). *Arceo* also stated that "the test to determine whether a defendant intended to commit more than one offense in the course of a criminal episode is whether the evidence discloses one general intent or discloses separate and distinct intents. *If there is but one intention, one general impulse, and one plan, there is but one offense.*" *Id.* (brackets and citation omitted) (emphasis added).

18. Article I, section 5 provides that "[n]o person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws, nor be denied the enjoyment of the person's civil rights or be discriminated against in the exercise thereof because of race, religion, sex or ancestry."

Article I, section 14, states in pertinent part that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury of the district wherein the crime shall have been committed ... Juries, where the crime charged is serious, shall consist of twelve persons."

B.

This court subsequently characterized the test for whether an *Arceo* instruction is necessary in *Hironaka* as follows:

> Beyond the context of sexual assault charges, this court has held that an *Arceo* unanimity instruction is required, absent an election by the prosecution, when "at trial, the prosecution adduced proof of two or more separate and distinct culpable acts; and the prosecution seeks to submit to the jury that only one offense was committed." Accordingly, *Arceo is not implicated if the prosecution adduces evidence of a series of acts by the defendant that constitute a "continuous course of conduct,"* and *the prosecution "argues that the requisite conduct element is satisfied by the defendant's continuous course of conduct, albeit that the defendant's continuous course of conduct may be divisible into conceptually distinct motor activity."*

99 Hawai'i at 207–08, 53 P.3d at 815–16 (citation, parenthetical, ellipsis, brackets, and footnote omitted) (emphases added). Thus, as long as evidence is adduced that the defendant engaged in a continuous "series of acts" constituting the crime charged, and the prosecution argues the case accordingly, a specific unanimity instruction is unnecessary.

C.

Relevant here, the *Arceo* court specifically noted that "theft of state property by deception, in violation of HRS § 708–830(2) (1993)[,]" among other offenses, is an example of a continuous offense. 84 Hawai'i at 19, 928 P.2d at 861 (citing *Martin,* 62 Haw. at 367–69, 616 P.2d at 196–97). With regard to theft by deception, as well as the other examples provided by this court of continuous offenses, this court stated that "[e]ach of these offenses is statutorily defined as an uninterrupted and continuing course of conduct, or manifests a plain legislative purpose to be treated as such, or both." *Id.* (citation omitted).

In *Martin,* this court addressed the question of whether theft in the first degree constituted a continuing offense where the defendant "wrongfully obtained public assistance monies exceeding $200 from the State of Hawaii by deception[.]" 62 Haw. at 365, 616 P.2d at 195. Recognizing that the question of whether a crime constitutes a continuous offense was a matter of first impression, *Martin* applied the test set forth in *People v. Howes,* 99 Cal.App.2d 808, 222 P.2d 969 (1950), requiring that the court consider " 'whether the evidence discloses one general intent or discloses separate and distinct intents[,]' " and stating that, "if 'there is but one intention, one general impulse, and one plan, even though there is a series of transactions, there is but one offense.' " *Martin,* 62 Haw. at 368, 616 P.2d at 196 (quoting *Howes,* 222 P.2d at 976). Under that rationale, this court concluded that there was "but one intention and plan here and thus . . . there was one offense[,]" explaining that

> [w]e do not view each filing by defendant of a statement of facts supporting continued eligibility as necessarily constituting a new offense, since all statements were identical, representing that defendant was unmarried, unemployed, and not receiving social security benefits.

*Id.* at 369, 616 P.2d at 197.

D.

1.

Based on the foregoing, the ICA did not gravely err in concluding that, on the facts of this case, theft by deception constitutes a continuous offense. Although the facts are not exactly the same as in *Martin,* inasmuch as, in that case, the court based its conclusion in part on the fact that the defendant's "statements were identical," *id.,* the same rationale applies here, because, based on Respondent's presentation of the case, Petitioner acted under "one general impulse," *id.* at 368, 616 P.2d at 196, and had "but one intention and plan," *id.* at 369, 616 P.2d at 197, *i.e.,* to unlawfully procure public assistance from the government through a "series of acts," *Arceo,* 84 Hawai'i at 18, 928 P.2d at 860, all directed toward the same overarching goal.

2.

At trial, Respondent sought to prove that Petitioner committed theft in the first degree

by deception, through a series of acts that occurred between July 2002 and May 2003, all directed toward receiving public assistance from Respondent. Although those acts were not identical, they all were closely related, inasmuch as each involved Petitioner's failure to report personal information to DHS that impacted her financial status. Respondent presented its case on the theory that *all* of those acts combined resulted in a total overpayment of $23,034.00, not that any of those acts individually, or any combination thereof, could have amounted to more than $20,000.00.

Respondent's closing argument reflected that its theory of the case was that a continuous "series of acts" committed by Petitioner between July 2, 2002, and May 31, 2003, resulted in theft in the first degree. In that connection, Respondent maintained that, "the offense of Theft in the First Degree [ ] was committed *during the period from July 2nd of 2002 through May 31st 2003.*" (Emphasis added.) As to the total amount of overpayments, Respondent stated that

> [t]he next [element] is that the value of the property exceeded $20,000. And as the [c]ourt read you an instruction, *amounts of theft committed pursuant to one scheme or course of conduct may be aggregated;* in other words, added together in determining the class or grade of the offense. And what that simply means is that if you find that [Petitioner] had committed theft, you can add up all the different instances where she committed theft and coming [sic] up with a final total which will be the determination of what kind of theft occurred in this case; *and what we're saying here is that it was over $20,000, and we know that by a set of calculations that the last witness, [Vallejo], calculated.*

(Emphases added.)

Respondent further asserted to the jury that Petitioner engaged in a "pattern" of conduct resulting in the charge of theft in the first degree, stating, "[W]hat you'll see is a *pattern of money going into th[e HSA] account,* it may be small at some times, but at others it's significant, *but the key point is, is that that information was never reported as it should have been[,]*" (emphases added); "[t]he other kinds of things that we should look at would be is there *a further pattern of not complying with welfare laws[,]*" (emphasis added); and, finally

> *the point is, is that if you look at this pattern, it is not simply a matter of isolated incident [sic] of mistakes being made. It is a pattern of something that was deliberately done,* and it was done to get free money from [Respondent] that she did not deserve, *and for that reason she committed this crime,* and I would be asking you for a verdict of guilty.

(Emphases added.) Respondent's theory was manifestly that Petitioner committed the crime based upon a "pattern" of conduct.

3.

Hence, contrary to Petitioner's assertion, this is not a case in which "several acts are alleged and any one of them could constitute the crime charged[,]" and, thus, there was no need for Respondent to "elect the particular criminal act upon which it will rely for conviction, or [for] the [court to] instruct the jury [sic] that all of them must agree that the same underlying criminal act has been proved beyond a reasonable doubt." *Shinyama,* 101 Hawai'i at 399, 69 P.3d at 527 (citation omitted). By virtue of the manner in which the evidence was presented in this case, in order to convict Petitioner of first degree theft by deception, the jury would have had to be unanimous as to all of the conduct alleged.

As stated *supra,* Vallejo was the DHS eligibility worker who determined the amount of public assistance Petitioner was overpaid based on the allegedly false or incomplete information she provided from July 2002 to May 2003. Vallejo's testimony indicates she considered *all* of the evidence presented to her when determining the total amount of overpayment:

> [Respondent]: . . . so, I guess sort of the starting point is how much assistance has been received?
>
> [Vallejo]: Yes.
>
> Q. And then what kinds of further things do you look at in order to determine whether there were overpayments?

A. I would have to look at what was not reported to [DHS] and see if she was entitled to the benefits that we provided to her on a monthly basis.

Q. Okay. Now, in terms of the kinds of things that you discovered were disqualifying factors, let's say.

A. Basically, we looked at her household composition, what was reported and not reported. We looked at income that was reported and not reported. And resources that she failed to report.

*So we look at everything, household—I looked at everything when I did the overpayment. I look at household composition, earned income, resources.*

. . . .

Q. So then the next thing that you have to look at would be the kind of income that individual would have received during a month?

A. Yes.

Q. And in terms of [Petitioner's] situation, what kinds of things did you find?

A. I found that she, with her income, that she failed to report. Some months is eligible. Some months is not eligible. So I can give an example of—let's say in her case she applied . . . July 2nd. And she reported two people in her household.

The standard for three people is $712. She reported the child support. However, there is $200 that she failed to report from [HSA]. So her income of $774 exceeded the 712 standard; therefore, whatever she received for the month of July, she was totally ineligible. And I followed that [sic] steps when I did the August, September, October up to May, 2003. And it's the same thing with the food stamps.

Q. Okay. So the kind of income that you were judging against were things like how much money that she was receiving from her business, [HSA], and from I guess employment from [DOE].

A. Right, and plus whatever the child support. For the first two weeks, she was receiving child support that she reported. *So anything that she reported, plus unreported income, were all considered on the amount that's available to her.*

. . . .

Q. . . . Now, in terms of the calculations of overpayments that you made, did you total up the amount of overpayments for each category?

A. Yes, I did.

Q. And could you give that to the jury, please.

A. For the financial assistance, the overpayment is 7,350. For the food stamps, it's 5,598. And for the medical $10,086 with a *grand total of $23,034.*

(Emphases added.) Thus, Respondent did not consider separately for each month whether Petitioner would have been eligible based on each item she failed to report, or on each of Petitioner's individual actions, but only performed the calculations based on a combination of all of the reported and unreported items, or on all of Petitioner's actions combined.

Contrary to Petitioner's assertion, then, there was no way that "one juror cold [sic] have found that one set of acts occurred that led to [Respondent] being deprived of more than $20,000, while another juror could have found that a *different* set of acts occurred that led to the deprivation of property valued at more than $20,000[,]" (emphasis in original), and thus, there was no unanimity issue.

X.

A.

Although Respondent presented its case with regard to Theft in the First Degree (Theft I) as a continuous offense, and therefore the ICA did not gravely err in concluding that the court was right in rejecting a requested unanimity instruction as to that count, we must conclude that the court gravely erred in failing to give a unanimity instruction as to the lesser included offense of Theft in the Second Degree (Theft II), on which it instructed the jury.

An instruction on Theft II was given by agreement of the parties. The court gave Supplemental Instruction No. 2, which outlined the lesser included offense of Theft II

for theft of property in excess of $300, under HRS § 708–831.[19]

Respondent did not object to this instruction.[20] Thus, it can be assumed that it was agreed that there was a rational basis in the evidence for the Theft II instruction. The only way that the jury could conclude that the evidence adduced supported a conviction on the Theft II charge, but not Theft I, would be by rejecting some quantum of the evidence presented by Respondent.

In that connection, defense counsel argued during the settling of jury instructions that an *Arceo* instruction was required with respect to the Theft II charge:

> The second issue that I have that I feel a lot more strongly about is the [*Arceo* ] issue. I know the [c]ourt's position is that this basically constitutes a continuous course of conduct. And normally in these type [sic] of theft cases, especially welfare cases where circumstances don't change from month to month for a period of say a year, I would agree with that. But in this case [Respondent] has introduced basically several different ways to disqualify [Petitioner] from the welfare benefits; *and because in any given month they are given ways to disqualify her, it is very possible that jurors could find she obtained benefits in one month illegally and in one month she did not.*
>
> *And my main concern is should they come back—because we're talking about an amount that is a little bit over the threshold amount. If they came back with a Theft II verdict, then it would be in violation of [Arceo] if some of the jurors felt like—if half the jurors, say felt like [Petitioner] obtained benefits for the first half of the year, but the other half felt like she obtained benefits for the second half of the year.*

(Emphasis added.) As indicated by defense counsel, if the jury were to return a verdict on Theft II, by virtue of rejecting some quantum of the evidence presented by Respondent, absent a unanimity instruction, it would be impossible to know which "series of acts" resulted in the Theft II charge.

In concluding that an *Arceo* instruction was unnecessary, the court stated it believed that the case law was

> pretty much consistent with the finding that the Theft I charged in this case *as well as the Theft II, which is a lesser included offense,* that the [c]ourt is going to allow the [c]ourt to consider continuing offenses that involve from the evidence a continuing course of conduct.
>
> *And as long as [Respondent] argues them as a continuing course of conduct, I think we are okay as far as [Arceo] is concerned,* and so those are the reasons for the [c]ourt's rejecting [Petitioner's] instruction on the [*Arceo* ] grounds.

(Emphases added.) The court's statement evinces that it may have overlooked the fact that Respondent never "argue[d Theft II] as

**19.** The Court's Supplemental Instruction No. 2 stated:

> If and only if you find the defendant not guilty of the offense of Theft in the First Degree, or you are unable to reach a unanimous verdict as to that offense, then you must determine whether the defendant is guilty or not guilty of the included offense of Theft in the Second Degree.
>
> A person commits the offense of Theft in the Second Degree if she obtains or exerts control over the property of another, the value of which exceeds $300, by deception with intent to deprive the other of that property.
>
> There are five material elements to the offense of Theft in the Second Degree, each of which the prosecution must prove beyond a reasonable doubt.
>
> These five elements are:
>
> 1. That the Defendant obtained and exerted control over the property of the State of Hawaii; and
> 2. That the Defendant did so by deception; and
> 3. That the Defendant did so with intent to deprive the State of Hawaii of the property; and
> 4. *That the value of the property exceeded $300;* and
> 5. That the Defendant believed that the value of the property exceeded $300.

(Emphasis added.)

**20.** At oral argument on July 20, 2009, Respondent indicated that it made no objection to the court's Theft II instruction because Respondent believed it had a strong case for Theft I. However, if Respondent failed to object to a Theft II instruction, it cannot now contend a Theft II instruction should not have been given or was superfluous.

a continuing course of conduct," but, instead, asserted that "what we're saying here is that it was *over $20,000,* and we know that by a set of calculations that the last witness, [Vallejo], calculated[,]" (emphasis added), and that Petitioner engaged in a pattern of conduct that resulted in a *"grand total of $23,-034[,]"* (emphasis added). Thus, the second requirement from *Hironaka,* that "the prosecution argue[ ] that the requisite conduct element is satisfied by the defendant's continuous course of conduct," 99 Hawai'i at 208, 53 P.3d at 816 (citations omitted), was not satisfied as to the Theft II offense.

Based on the foregoing, if the evidence is presented in a similar manner upon remand, a unanimity instruction will be necessary as to the Theft II charge, in order to ensure that, in the event that a Theft II verdict is returned, the jury agrees unanimously upon the underlying conduct resulting in the Theft II conviction, thereby fulfilling "the purpose of an *Arceo* unanimity instruction[,]" which "is to eliminate any ambiguity that might infect the jury's deliberations respecting the particular conduct in which the defendant is accused of engaging and that allegedly constitutes the charged offense." *State v. Kassebeer,* 118 Hawai'i 493, 508, 193 P.3d 409, 424 (2008) (citation omitted).[21]

B.

Additionally, if it is undisputed that Petitioner was entitled to an instruction on Theft II, reason dictates that Petitioner was also entitled to jury instructions on the lesser included offenses of Theft in the Third Degree (Theft III) under HRS § 708-832 (1993), and Theft in the Fourth Degree (Theft IV) under HRS § 708-833 (1993).

1.

The Commentary on Hawai'i theft statutes, HRS §§ 708-830 to 708-833 (1993), establishes varying degrees of theft based on the value of the property or service.

> The Code is in accord with the [MFC] and other recent revisions in grading the theft offenses according to the mode of the theft, the object involved, and the value of the property or services stolen. *The gradation is based on the theory that theft* from the person, or of a firearm, or *of property or services of relatively high value presents greater social harm* and that the actor in such cases may require greater rehabilitation efforts. Moreover, the ordinary person, insofar as value of the property or services is concerned, "feels a lesser repugnance to taking small amounts than large amounts."

(Footnote and citation omitted.) (Emphases added.) This court has stated that trial courts "must instruct juries as to any included offenses when 'there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense[.]'" *State v. Haanio,* 94 Hawai'i 405, 413, 16 P.3d 246, 254 (2001) (citing HRS § 701-109(5) (1993)).

But, while the court provided jury instructions on the lesser included offense of Theft II, it refused jury instructions on lesser included offenses of Theft III (the "Court's Supplemental Instruction No. 3")[22] and

21. Based on the foregoing, it should be noted that, although theft by deception has been defined as a continuous offense in other contexts, where it does not satisfy the requirements for a continuous offense that have been set forth in our case law regarding specific unanimity instructions, the offense will not be considered continuous. Thus, *Martin* does not stand for the proposition that theft by deception is always a continuous offense, but only that it may be under certain circumstances, such as those presented herein with regard to Theft I. However, when the dangers of *Arceo* are implicated, *i.e.,* when uncertainty exists over which specific acts of the defendant support a given offense, a specific unanimity instruction is necessary.

22. The "Court's Supplemental Instruction No. 3," which was refused over objection by Petitioner, states:

> If and only if you find the defendant not guilty of the offense of Theft in the First Degree, or you are unable to reach a unanimous verdict as to that offense, and you find the Defendant not guilty of the offense of Theft in the Second Degree, or you are unable to reach a unanimous verdict as to that offense, then you must determine whether the defendant is guilty or not guilty of the included offense of Theft in the Third Degree.
>
> A person commits the offense of Theft in the Third Degree if she obtains or exerts control over the property of another, the value of

Theft IV (the "Court's Supplemental Instruction No. 4")[23] over objections by Petitioner,

During the settlement of jury instructions, Petitioner's counsel objected to Jury Instruction No. 8.04 as modified, which added the offense of Theft II to the jury's consideration. Instruction No. 8.04, as modified, states:

> You may bring in one of the following verdicts:
>
> 1. Not guilty; or
> 2. Guilty as charged; or
> 3. Guilty of the included offense of Theft 2.
>
> Your verdict must be unanimous.
>
> After a verdict has been reached and your foreperson has signed and dated the verdict form, you will notify the bailiff, and court will be reconvened to receive the verdict.

However, Petitioner's counsel's objection was not to the essence of second degree theft, but to the refusal of the court to also instruct on the offenses of third degree and fourth degree theft:

> Judge, I guess this goes to the instruction we were about to talk about. I think that there is a scintilla of evidence that the *jury could come back in an amount between $100 and $300 certainly, and even possibly less than $100* of an amount is likely, but I think a scintilla exists *for both Theft III and IV.*

(Emphases added.) Petitioner's counsel made the same objection to the court's refusal of the court's supplemental instructions nos. 3 and 4, noted above. In refusing the instruction, the court stated, "The [c]ourt does not think there's a rational basis in the evidence to convict of the lesser included offenses[.]" But the court did not explain why it determined there was a rational basis for giving a second degree theft instruction but not theft in the third and fourth degree instructions.[24]

which exceeds $100, by deception with intent to deprive the other of that property.

There are five material elements to the offense of *Theft in the Third Degree,* each of which the prosecution must prove beyond a reasonable doubt.

These five elements are:

1. That the Defendant obtained and exerted control over the property of the State of Hawaii; and
2. That the Defendant did so by deception; and
3. That the Defendant did so with intent to deprive the State of Hawaii of the property; and
4. *That the value of the property exceeded $100;* and
5. That the Defendant believed that the value of the property exceeded $100.

(Emphases added.)

23. The "Court's Supplemental Instruction No. 4," which was also refused over objection by Petitioner, states:

> If and only if you find the defendant not guilty of the offense of Theft in the First Degree, or you are unable to reach a unanimous verdict as to that offense, and you find the Defendant not guilty of the offense of Theft in the Second Degree, or you are unable to reach a unanimous verdict as to that offense, and you find the Defendant not guilty of the offense of Theft in the Third Degree, or you are unable to reach a unanimous verdict as to that offense, *then you must determine whether the defendant is guilty or not guilty of the included offense of Theft in the Fourth Degree.*
>
> A person commits the offense of Theft in the Fourth Degree if she obtains or exerts control over the property of another, of any value not in excess of $100, by deception with intent to deprive the other of that property.
>
> *There are five material elements to the offense of Theft in the Fourth Degree,* each of which the prosecution must prove beyond a reasonable doubt.
>
> These five elements are:
>
> 1. That the Defendant obtained and exerted control over the property of the State of Hawaii; and
> 2. That the Defendant did so by deception; and
> 3. That the Defendant did so with intent to deprive the State of Hawaii of the property; and
> 4. *That the property was of any value not in excess of $100;* and
> 5. That the Defendant believed that the property was of any value not in excess of $100.

(Emphases added.)

24. The court also refused Petitioner's Amended Requested Jury Instruction No. 1, which states in part:

> In order for you to find Defendant ANGELA STENGER guilty of *Theft in any degree,* you must unanimously answer at least one of the following questions with a "yes" response on the special interrogatory form which will be provided to you:
>
> Did you unanimously find beyond a reasonable doubt that Defendant ANGELA STENGER obtained and exerted control over the property of the State of Hawaii by deception

2.

The court instructed the jurors that they were the exclusive judges of the "effect and value of the evidence" and "credibility of the witnesses":

> While you must consider all of the evidence in determining the facts in this case, *this does not mean that you are bound to give every bit of evidence the same weight. You are the sole and exclusive judges of the effect and value of the evidence and of the credibility of the witnesses.*

(Emphasis added.) The court also instructed the jury on the credibility and weight of testimony:

> *It is your exclusive right to determine whether and to what extent a witness should be believed and to give weight to his or her testimony accordingly.* In evaluating the weight and credibility of a witness's testimony, you may consider the witness's appearance and demeanor; the witness's manner of testifying; the witness's intelligence; the witness's candor or frankness, or lack thereof; the witness's interest, if any, in the result of this case; the witness's relation, if any, to a party; the witness's temper, feeling, or bias, if any has been shown; the witness's means and opportunity of acquiring information; the probability or improbability of the witness's testimony; the extent to which the witness is supported or contradicted by other evidence; the extent to which the witness has made contradictory statements, whether in trial or at other times; and all other circumstances surrounding the witness and bearing upon his or her credibility.
>
> *Inconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses, may or may not cause you to discredit such testimony.* In weighing the effect of inconsistencies or discrepancies, whether they occur within one witness's testimony or as between different witnesses, consider whether they concern matters of importance or only matters of unimportant detail, and whether they result from innocent error or deliberate falsehood. [25]

(Emphases added.)

The court's instructions that the jury may in effect reject part or all of a witness's testimony or other evidence allowed the jury to independently determine to what extent, if any, deception had been employed by Petitioner and, thus, countenanced not only an instruction as to second-degree theft, but also instructions on third-degree and fourth-degree theft. Because the jury was the exclusive judge of the "value of evidence" and "credibility of witnesses," it had the ultimate discretion to decide "to what extent a witness should be believed" and whether "to discredit" testimony. Hence, the jury could determine, based on its evaluation of the witnesses' testimony and evidence, that varying amounts of less than $20,000 had been obtained by deception.

Because the court instructed the jury that it could reject the testimony of any witness except for parts "which you nevertheless believe to be true," the jury could find Petitioner committed theft of not only less than $20,000, but less than $300 or less than $100, making the offenses of Theft III or Theft IV applicable. This is the only logic that can be applied to the giving of the second-degree theft instruction. If the jury could determine that Petitioner obtained less than $20,000 by deception but more than $300, it was free, on the same evidence, to determine alternatively that even less was obtained by deception.

and with the intent to deprive the State of Hawaii of the property during any of the following months:

(Emphasis added.) This requested jury instruction listed each month from July 2002 to May 2003, with spaces for the jury to "indicate the amounts which you unanimously agree Defendant obtained control over during this month" in financial benefits, food stamp benefits, and/or medical benefits.

**25.** The court additionally instructed the jury that if "you find that a witness has deliberately testified falsely to any important fact or deliberately exaggerated or suppressed any important fact, then you may reject the testimony of that witness except for those parts which you nevertheless believe to be true."

Respectfully, the court's refusal to provide instructions on the lesser included offenses of Theft III and Theft IV was inconsistent with the giving of an instruction on Theft II inasmuch as, on the same evidence, the extent to which such evidence was credible was within the jury's exclusive discretion to determine. In light of the circumstances, as tried by Respondent, jury instructions on the lesser included offenses of Theft III and Theft IV should have been given.[26]

3.

It is established in this jurisdiction that "juries are obligated to render true verdicts based on the facts presented; hence, barring their consideration of lesser included offenses supported by the evidence undermines their delegated function.... Most significantly, an all or nothing approach impairs the truth seeking function of the judicial system." *Haanio,* 94 Hawai'i at 415, 16 P.3d at 256 (citation omitted). As was said in *Haanio:*

> The judicial objectives within the context of the criminal justice system are to assess criminal liability and to determine appropriate punishment if and when warranted. Acceding to an "all or nothing" strategy, albeit in limited circumstances, forecloses the determination of criminal liability where it may in fact exist. Thus, elevating a "winner take all" approach over such a determination is detrimental to the broader interests served by the criminal justice system.

*Id.* at 414, 16 P.3d at 255.

In light of the "all or nothing strategy" of Respondent, an omission of relevant lesser included offense instructions is contrary to the proposition that the jury must seek the truth. This critical jury function requires that its members be fully informed on the law as instructed by the court. Therefore, providing instructions on all lesser included offenses with a rational basis in the evidence is essential to the performance of the jury's function.

XI.

Based on the foregoing, the ICA's judgment is vacated in part, the court's judgment is vacated, and the case remanded for a new trial consistent with this opinion.

Concurring Opinion by Circuit Judge KIM, J.

I concur with the majority in both the holdings and the analysis supporting them on all issues in this case. I write separately only to comment briefly on Justice Nakayama's belief that "this court should hold that the trial court is not required to instruct the jury *sua sponte* as to every defense regardless of 'how weak,' and that such failure is not an 'instructional error' warranting appellate review under *[State v.] Nichols[,* 111 Hawai'i 327, 141 P.3d 974 (2006) ]." Dissenting op. by Nakayama, J. at ——, 226 P.3d at 475–76. I do not believe that the majority opinion stands for the proposition implicit in the foregoing statement. I do not believe that it necessarily follows from the majority opinion that, as a matter of law, a trial court is hereafter required to instruct the jury *sua sponte* as to every conceivable defense suggested by the evidence in a given case.

First of all, I would contend that, for all reasonable intents and purposes, the defense in the instant case did essentially request a jury instruction on the mistake of fact defense when it mistakenly requested one on claim of right. As is made clear by the majority, the claim of right defense is, in fact, completely subsumed within the mistake of fact defense, being "logically encompassed" by the latter. It is, therefore, unsurprising that the specific arguments proffered by the defense at trial in support of its request for the claim of right defense actually were more appropriate to a request for the more generic mistake of fact defense. In effect, the defense had the theory right, but the specific instruction wrong, and the trial court, while correctly recognizing the latter, mistakenly failed to recognize the former; thus, the resulting confusion and the subsequent instructional error in the case, further compounded by the Intermediate Court of Ap-

26. Based on the rationale set forth *supra* regarding Theft II, it would also be necessary that the specific unanimity instruction be applied to the lesser included offenses of Theft III and Theft IV.

peals' (ICA) erroneous analysis and holding on the issue.

The specter raised by Justice Nakayama's dissent of trial courts hereafter being responsible as a matter of law for combing through the entire body of evidence in search of every possible defense theory that may fit is, in my view, not warranted by the specific holding of the majority in this case, based as it is on the specific facts of this case, especially where, as here, the theory at issue formed the very heart of the defense case, rather than some nebulous, barely glimpsed theory on the margins. The errors by both the trial court and the ICA at issue in the present case were substantial and required correction, and the majority has done so.

Justice Nakayama's dissent suggests that, by its decision here, the majority has provided a standard for defense instructions set so low that a defendant can now "easily argue on appeal that the circuit court committed reversible error in failing *sua sponte* to issue every [possible] defense instruction regardless 'how weak.'" Dissenting op. by Nakayama, J. at 308, 226 P.3d at 478. With respect, I do not believe that the majority has done this, nor do I believe that the instant opinion will lend more than scant support, if any, to such a hypothetical future defendant/appellant.

Dissenting Opinion by MOON, C.J.

I agree with Justice Nakayama's dissent that a trial court does not have a duty to *sua sponte* instruct the jury on a particular defense "when there is evidence—however weak—that supports the consideration of that issue," dissenting op. at 301, 226 P.3d at 471, as the majority's opinion implies. *See* majority op. at 281–84, 226 P.3d at 451–54. In that regard, I cannot agree with Judge Kim that "it do[es] not ... necessarily follow [ ] from the majority opinion that[,] as a matter of law, a trial court is hereafter required to instruct the jury *sua sponte* as to every conceivable defense suggested by the evidence in a given case." Concurring op. at 296, 226 P.3d at 466. Here, the majority answered the question, *i.e.*, "whether Petitioner presented any evidence, 'no matter how weak,' that would have supported the jury's consideration of a mistake of fact defense," majority op. at 281, 226 P.3d at 451, in the affirmative. *See* majority op. at 281–83, 226 P.3d at 451–53. Having done so, the majority—observing that Petitioner did *not* specifically request a mistake of fact instruction—proceeds to examine "whether the court's *failure* to instruct ... was harmless beyond a reasonable doubt." *Id.* (emphasis added). It then concludes that the court's failure to instruct was not harmless. *Id.* Thus, when considered together, it *does*—in my view—"necessarily follow [ ]" that, based on the majority's discussion, "a trial court is hereafter required to instruct the jury *sua sponte* as to every conceivable defense suggested by the evidence in a given case." Concurring op. at 296, 226 P.3d at 466. Consequently, as previously indicated, I agree with Justice Nakayama that a trial court does not have a duty "to instruct the jury *sua sponte* as to all defense instructions that may possibly be implicated by the facts." Dissenting op. at 306, 226 P.3d at 476.

However, I respectfully disagree with Justice Nakayama's conclusion that a trial court is *never* required, absent a request by the parties, to so instruct. For that reason, I write separately to explain my disagreement with the broad view of the majority's implicit "holding" and the narrow view of Justice Nakayama's dissent, as well as suggest a different approach upon which my concurrence in the dissent's ultimate result is based.

In her dissent, Justice Nakayama proposes the rule that "[a]n instruction as to a defense is *not* required if the defendant or prosecution, for strategic reasons, do not request it." *Id.* at 303, 226 P.3d at 473 (emphasis added) (citations omitted). In so doing, Justice Nakayama looks to *State v. Locquiao*, 100 Hawai'i 195, 58 P.3d 1242 (2002), which specifically provides that a trial court is not required to issue a mistake of fact defense *sua sponte;* rather, such instruction is contingent upon the defendant's request. *Id.* at 208, 58 P.3d at 1255.

In support of her position, Justice Nakayama explains that, according to the majority's holding,

> when requested by a defendant, a defense instruction is required to be given if the evidence fairly raises the issue, regardless of "how weak, unsatisfactory, or inconclusive" the evidence may be. Because of the low standard governing defense instructions, it would be extremely problematic to require a court to instruct the jury sua sponte as to **all** defense instructions that may possibly be implicated by the facts. This requirement would (1) burden the trial court with the duty to examine every possible theory that may fit the entire body of evidence before the court, (2) restructure the adversary system contrary to the interests of both the prosecution and defendant, and (3) create incentives for a defendant not to request a defense instruction.

Dissenting op. at 306, 226 P.3d at 476 (citations omitted) (underscored emphasis in original) (bold emphasis added). Although I agree that it would be "extremely problematic" to impose a duty on the trial court to instruct the jury *sua sponte* as to *all* possible defense instructions that may be implicated by the facts, I believe, as discussed below, that it would be appropriate, under certain circumstances, to impose a duty on the trial court to *sua sponte* instruct as to defenses.

In *People v. Barton,* 12 Cal.4th 186, 47 Cal.Rptr.2d 569, 906 P.2d 531, 536 (1995), the Supreme Court of California compared a trial court's duty to instruct the jury with regard to lesser included offenses versus its duty, if any, to instruct on particular defenses. In so doing, the court rejected the defendant's request that an instruction as to a lesser included offense be treated the same as an instruction on particular defenses, *id.*, holding that:

> [A] trial court must, *sua sponte,* or on its own initiative, instruct the jury on lesser included offenses "when the evidence raises a question as to whether all of the elements of the charged offense were present, but not when there is no evidence that the offense was less than that charged.....
>
> In contrast to lesser included offenses, *a trial court's* ***duty*** *to instruct, sua sponte, or on its own initiative, on particular defenses is more limited, arising "only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case."*

*Id.* at 573, 906 P.2d at 535 (citations omitted) (emphases added).

In *People v. Maury,* 30 Cal.4th 342, 133 Cal.Rptr.2d 561, 68 P.3d 1, 60 (2003), the Supreme Court of California examined, among other things, the issue whether the trial court erred in failing to *sua sponte* instruct the jury on the defense of reasonable and good faith mistake of fact regarding a person's consent to sexual intercourse. *Id.* at 631, 68 P.3d at 60. Consistent with the view expressed by the *Barton* court, the *Maury* court stated that "[a] trial court's duty to instruct, *sua sponte,* on particular defenses arises only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." *Id.* (internal quotations omitted). The court concluded that, because "[its] review of the record shows no substantial evidence to trigger a *sua sponte* obligation to give [a mistake of fact jury] instruction," the trial court was not obliged to so instruct. *Id.; see also People v. Villanueva,* 169 Cal.App.4th 41, 49, 86 Cal.Rptr.3d 534 (2008) (applying the rule that "[a] trial court is required to instruct *sua sponte* on any defense, including self-defense, only when there is substantial evidence supporting the defense, and the defendant is either relying on the defense or the defense is not inconsistent with the defendant's theory of the case."); *People v. Montoya,* 7 Cal.4th 1027, 31 Cal.Rptr.2d 128, 874 P.2d 903, 915 (1994) ("It is settled that, even in the absence of a request, a trial court must instruct on general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case.") (citations omitted); *People v. Burnham,* 176 Cal.App.3d 1134, 1139–40, 222 Cal.Rptr. 630 (1986) (recognizing that a defendant must demonstrate substantial evidence supporting a de-

fense in order to require the trial court to issue a *sua sponte* instruction on the defense) (citation omitted).

In my view, the rule set forth by California courts that a trial court has a duty to *sua sponte* instruct the jury on potential defenses when (1) it appears that the defendant relies on such defense or (2) there is substantial evidence to support a defense and such defense is not inconsistent with the defendant's theory of the case [hereinafter, the *Barton* rule] is the more appropriate rule to apply in the instant case and in future cases. As discussed below, I believe that the *Barton* rule, contrary to the rules advanced by the majority and Justice Nakayama, preserves a trial court's discretion, protects a defendant's right to a fair trial, and also promotes the important interest of judicial economy.

First, the *Barton* rule would eliminate (1) the undue burden on the trial court of reviewing "the entire body of evidence and considering every defense that may be applicable to the facts," dissenting op. at 306, 226 P.3d at 476, and (2) the potential of prejudice to the defendant. *See Barton,* 47 Cal. Rptr.2d 569, 906 P.2d at 536 (stating that, "to require trial courts to ferret out all defenses that might possibly be shown by the evidence, even when inconsistent with the defendant's theory at trial, would not only place an undue burden on the trial courts but would also create a potential of prejudice to the defendant" and "[a]ppellate insistence upon sua sponte instructions which are inconsistent with defense trial theory or not clearly demanded by the evidence would hamper defense attorneys and put trial judges under pressure to glean legal theories and winnow the evidence for remotely tenable and sophistical instructions") (internal citations and quotations omitted); *People v. Wade,* 53 Cal.2d 322, 1 Cal.Rptr. 683, 348 P.2d 116, 125 (1959) ("Omniscience is not required of our trial courts."), overruled on other grounds in *People v. Carpenter,* 15 Cal.4th 312, 63 Cal. Rptr.2d 1, 935 P.2d 708, 747 (1997).

Second, I believe the adoption of the *Barton* rule supports and is in accordance with "the interests of both the prosecution and defendant," dissenting op. at 306, 226 P.3d at 476, inasmuch as the trial court would not be called upon to create or implement defense strategy—a burden that should be left to defense counsel. *See Shells v. State,* 642 So.2d 1140, 1141 (Fla.Dist.Ct.App.1994). Rather, the rule properly delegates to the trial court the role of selecting and presenting those defense instructions implicated by substantial evidence and supportive of a legal theory that is not inconsistent with the defendant's legal theory of the case. Thus, any "incentives for a defendant *not* to request a defense instruction," about which Justice Nakayama expressed concern, *see* dissenting op. at 306, 226 P.3d at 476 (emphasis in original), would no longer be present.

Finally, the adoption of the *Barton* rule, unlike the rules set forth by the majority and Justice Nakayama, promotes the interest of judicial economy. In my view, the majority's approach, requiring *sua sponte* instructions for all defenses, no matter how weak the evidence, would unduly burden the trial court and arguably increase the likelihood of error. By the same token, Justice Nakayama's approach, requiring the giving of a particular instruction to the jury only when requested, ignores the important policy that it is the *trial court's* duty to maintain fairness in the courtroom and, as such, it must ensure that a defendant receives a fair trial.

Based on the foregoing, I would hold, contrary to the broad duty imposed by the majority and the narrow duty imposed by Justice Nakayama's dissent, that the trial court has a *limited* duty to *sua sponte* instruct the jury on a particular defense only if (1) it appears that the defendant is relying on such a defense, or (2) if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case. Nevertheless, I agree with Justice Nakayama that, "even if trial courts have a duty to instruct the jury *sua sponte* on defenses supported by 'substantial evidence,'" dissenting op. at 309, 226 P.3d at 479 n. 6, the trial court's failure to instruct in this case was harmless. *Id.* at 308–12, 226 P.3d at 478–82. Indeed, I believe that the evidence in this case "overwhelmingly" indicates that Stenger knew the reporting requirements and failed to comply. Consequently, I agree with Justice Nakaya-

ma's ultimate conclusion that "the trial court's failure to instruct *sua sponte* on the mistake of fact defense was harmless because it was not reasonably possible that the issuance of a separate mistake of fact instruction could have supported a finding that Stenger did not knowingly deceive DHS." *Id.* at 312, 226 P.3d at 482.

Dissenting Opinion by NAKAYAMA, J., in which MOON, C.J., joins in part.

I respectfully dissent from the majority's holdings that: (1) the ICA gravely erred because the trial court should have *sua sponte* instructed the jury on the mistake of fact defense; and (2) the trial court's failure to separately instruct the jury on the mistake of fact defense was not harmless.

### A. The Trial Court Was Not Required To Instruct the Jury *Sua Sponte* On the Mistake Of Fact Defense.

The majority holds that the ICA gravely erred because the trial court should have *sua sponte* instructed the jury on the mistake of fact defense. Although this court has clearly stated that the trial court has the duty to "properly instruct the jury," this court has not resolved whether, under this rule, the trial court must *sua sponte* instruct the jury as to a defense instruction. *Cf. State v. Pinero,* 75 Haw. 282, 305 n. 13, 859 P.2d 1369, 1380 n. 13 (1993) (noting that, in resolving the point of error, the court need not determine whether "a trial court is required to provide self-defense instructions, *sua sponte,* whenever supported by the evidence"), *disapproved of on other grounds by Raines v. State,* 79 Hawai'i 219, 900 P.2d 1286 (1995).

Although I recognize that a trial court has the duty to instruct the jury properly and that appellate courts may vacate once instructional error is demonstrated, these rules cannot logically be construed to provide that the trial court's failure to instruct *sua sponte* as to a defense constitutes instructional error. Instead, in my view, this court should hold that the right to the mistake of fact instruction only accrues *after* the defendant or prosecution requests the defense instruction, in order to promote judicial efficiency, as well as take into consideration the duties of the prosecution and defense counsel.

Stenger requested that the trial court instruct the jury as to the claim of right defense, but she apparently decided not to request a mistake of fact instruction.[1] Nevertheless, she argues on appeal that the trial court committed plain error in failing to give a mistake of fact instruction *sua sponte.*

Preliminarily, I recognize that this court has repeatedly stated that the trial court has the duty to instruct the jury properly:

> [it] is the *duty of the circuit judge* to see to it that the case goes to the jury in a clear and intelligent manner, so that they may have a clear and correct understanding of what it is they are to decide, and he [or she] shall state to them fully the law applicable to the facts. *State v. Feliciano,* 62 Haw. 637, 643, 618 P.2d 306, 310 (1980) (quoting *People v. Henry,* [395 Mich. 367,] 236 N.W.2d 489, 492 (1975)) (emphasis added). And faced with inaccurate or incomplete instructions, "[the] *trial court has a duty to,* with the aid of counsel, either correct the defective instruction or to otherwise *incorporate it into its own instruction.*" *State v. Riveira,* 59 Haw. 148, 155, 577 P.2d 793, 797 (1978) (emphasis added and citations omitted).... In other words, the ultimate responsibility properly to instruct the jury ... [lies] with the circuit court and *not* with trial counsel.

*State v. Kupau,* 76 Hawai'i 387, 395, 879 P.2d 492, 500 (1994), *overruled on other grounds by State v. Haanio,* 94 Hawai'i 405, 407, 16 P.3d 246, 248 (2001) (quoting *Briones v. State,* 74 Haw. 442, 472–73, 848 P.2d 966, 980

1. As stated in the majority opinion, the "Petitioner presented evidence that could have supported the conclusion that she mistakenly believed that she in fact provided all of the required information, which would have been a factual mistake, and not a mistake as to any statutory law." Majority opinion at 282, 226 P.3d at 452. If Stenger had requested the mistake of fact instruction, under *State v. Locquiao,* 100 Hawai'i 195, 205, 58 P.3d 1242, 1252 (2002), the trial court would have been required to instruct the jury as to this defense. *See* Majority opinion at 482–83, 226 P.3d at 452–53.

(1993) (Levinson, J., concurring) (emphasis in original)) (some citations omitted, ellipses in original); *State v. Gomes,* 93 Hawai'i 13, 21–22, 995 P.2d 314, 322–23 (2000) (citations omitted); *State v. Kassebeer,* 118 Hawai'i 493, 511, 193 P.3d 409, 427 (2008) (citation omitted); *State v. Murray,* 116 Hawai'i 3, 14 n. 9, 169 P.3d 955, 966 n. 9 (2007) (citation omitted).

Because of the trial court's duty to instruct the jury properly, this court has held that, "although as a general matter forfeited assignments of error are to be reviewed under the HRPP Rule 52(b) plain error standard of review, in the case of erroneous jury instructions, that standard of review is effectively merged with the HRPP Rule 52(a) harmless error standard of review. . . ." *State v. Nichols,* 111 Hawai'i 327, 337, 141 P.3d 974, 984 (2006). Consequently, "once *instructional error is demonstrated,* we will vacate, without regard to whether timely objection was made, if there is a reasonable possibility that the error contributed to the defendant's conviction, *i.e.,* that the erroneous jury instruction was not harmless beyond a reasonable doubt." *Id.* (emphasis added).

Under the foregoing rules, it is not apparent that the trial court is required to issue a defense instruction *sua sponte* when there is evidence—however weak—that supports the consideration of that issue. *See State v. Auld,* 114 Hawai'i 135, 146, 157 P.3d 574, 585 (App.2007) (Nakamura, J., concurring and dissenting). Although this court has not settled whether a trial court's failure to issue a defense instruction *sua sponte* results in an "instructional error" that requires the vacation of the defendant's conviction, the ICA has held that trial courts must instruct the jury *sua sponte* on defenses that are "permitted by the evidence." *Id.* at 145, 157 P.3d at 584. In *Auld,* Auld was tried on two counts of terroristic threatening and three counts of assault in the third degree. *Id.* at 136, 157 P.3d at 575. His "primary defense with respect to the Terroristic Threatening charges was that he never threatened anyone with the knife." *Id.* at 144, 157 P.3d at 583 (internal quotation marks omitted). Auld requested a self-defense instruction with respect to the assault charges, but did not request a self-defense instruction with respect to the terroristic threatening charges. *Id.* at 146–47, 157 P.3d at 585–86 (Nakamura, J., concurring and dissenting). After failing to request a self-defense instruction at trial with respect to the terroristic threatening charges, on appeal he asserted that the trial court erred by failing to give a self-defense instruction because "the evidence presented at trial also fairly raised the issue of self-defense." *Id.* at 144, 157 P.3d at 583 (internal quotation marks omitted). The ICA held that Auld was entitled to a self-defense instruction *sua sponte* and reasoned that "*regardless of the defendant's theory of defense, the defendant and/or the defense counsel cannot stop the court from giving to the jury a self-defense instruction that is permitted by the evidence.*" *Id.* at 145, 157 P.3d at 584 (emphasis added). Pursuant to *Auld,* Hawai'i's trial courts must issue a defense instruction "permitted by the evidence" *sua sponte* even if it conflicts with the defendant's trial strategy.

In my view, *Auld* was wrongly decided and should be overturned partly for the reasons outlined by Judge Nakamura in his concurring and dissenting opinion. Judge Nakamura dissented to the majority's opinion that the defendant was entitled to a self-defense instruction *sua sponte.* *Id.* at 145–46, 157 P.3d at 584–85 (Nakamura, J., concurring and dissenting). Judge Nakamura dissented because although "Hawai'i law is clear that *when requested by a defendant,* the trial court is required to give a self-defense instruction if the evidence fairly raises the issue of self-defense[,]" it is "less apparent . . . whether Hawai'i law requires the trial court to instruct the jury on self-defense when the defendant for strategic reasons decides he or she does not want the instruction." *Id.* at 146, 157 P.3d at 585. Judge Nakamura would have held that the "the trial court had no duty to give and did not err in failing to give a self-defense instruction on the terroristic threatening charges which Auld did not request and apparently for strategic reasons did not want." *Id.* at 150, 157 P.3d at 589. Judge Nakamura was concerned that a rule requiring trial courts to give defense instructions *sua sponte* when inconsistent with a defendant's theory of the

case would "impair the defendant's ability to present his or her defense[,]" place trial courts in the difficult position of having to determine whether unargued defenses apply, and "create the potential for manipulation." *Id.* at 148, 148–49, 157 P.3d at 587, 587–88.

Based on the case law governing defense instructions and Judge Nakamura's concurring and dissenting opinion in *Auld,* I must also conclude that a trial court's duty to instruct the jury properly does not include the duty to instruct the jury *sua sponte* as to a defense instruction. Therefore, in my view, this court should overrule *Auld,* and hold that a court's failure to *sua sponte* instruct the jury of a defense is not an "instructional error" that requires an appellate court to "vacate, without regard to whether timely objection was made."

1. *As this court has previously stated, a defense instruction must be requested by the defendant or prosecution.*

This court has previously stated that either the *defendant* or *prosecution* must *request* the defense instruction before the trial court is responsible to instruct as to the defense. In *Pinero,* 75 Haw. at 303–05, 859 P.2d at 1379–80, this court reviewed whether the defendant's right to a fair trial was prejudiced when the court, at the prosecution's request, instructed the jury concerning self-defense. At trial, the defendant objected to the instructions because self-defense was not part of his theory of the case. *Id.* at 303, 859 P.2d at 1379. In *Pinero,* this court acknowledged the trial court's "duty" to "instruct the jury on every defense or theory of defense having any support in the evidence," but expressly limited its duty, stating that "[t]he factual circumstances underlying our precedent, however, make clear that the court's 'duty' is *only prompted by a requested instruction.*" *Id.* at 304–05, 859 P.2d at 1380 (emphasis added) (citing *State v. Pinero,* 70 Haw. 509, 525, 778 P.2d 704, 715 (1989); *State v. O'Daniel,* 62 Haw. 518, 527–28, 616 P.2d 1383, 1390–91 (1980) (ruling that "[t]he trial court did not err in refusing to give the requested instruction on accidental death")). Finding that the prosecution met this requirement when it requested the self-defense instruction, it then proceeded to discuss whether the court was entitled to give the instruction without the consent of the defendant. *Id.* at 305, 859 P.2d at 1380. This court ruled that "self-defense instructions *requested by the prosecution* should be given unless the defendant objects to the giving of the instructions on the basis that the record does not reflect any evidence on this issue and the trial court agrees with the defendant." *Id.* (emphasis added). A request from either party permits both parties to present arguments as to whether the evidence supports this issue and allows the trial court to decide, based on their arguments, whether to issue the instruction.

There are several established rules that are pertinent to this issue: (1) a "defendant is entitled to every defense ... having any support in the evidence ..." (2) a trial court is required to instruct the jury properly, and (3) a trial court must *sua sponte* instruct "as to any included offense having a rational basis in the evidence." Nevertheless, none of them can be logically construed to require the trial court to instruct the jury as to every defense, "no matter how weak," *sua sponte.*

I recognize the well-established precedent that "a defendant is *entitled* to an instruction on every defense or theory of defense having any support in the evidence, provided such evidence would support the consideration of that issue by the jury, no matter how weak, inconclusive, or unsatisfactory the evidence may be."[2] *State v. Hironaka,* 99 Hawai'i

2. This jurisdiction's standard for defense instructions is rooted in *Territory v. Alcantara,* 24 Haw. 197 (Haw.Terr.1918), which reviewed whether the trial court erred in refusing to submit to the jury a manslaughter instruction in the defendant's conviction of murder in the first degree. The *Alcantara* court's standard was intended to prevent a trial court from withholding a defense from the jury:

> The trial of criminal cases is by a jury of the country, and not by the courts. The jurors, and they alone, are to judge of the facts, and weigh the evidence. The law has established this tribunal because it is believed that, from its numbers, the mode of their selection, and the fact that the jurors come from all classes of society, they are better calculated to judge of motives, weigh probabilities, and take what may be called a common sense view of a set of

198, 204, 53 P.3d 806, 812 (2002) (quoting *State v. Maelega*, 80 Hawai'i 172, 178–79, 907 P.2d 758, 764–65 (1995)) (internal quotation marks omitted) (emphasis added). In addition, pursuant to the trial court's duty to instruct a jury properly, it is required to "state to [the jury] fully the law applicable to the facts." *State v. Feliciano*, 62 Haw. 637, 643, 618 P.2d 306, 310 (1980) (citation omitted). I do not dispute that a defense, such as mistake of fact, is a (1) law that (2) *may* be applicable to the facts presented. *See, e.g.*, Hawai'i Revised Statutes ("HRS") § 702–218 (1993) (providing that "it is a defense that the accused engaged in the prohibited conduct under ignorance or mistake of fact if ... [t]he ignorance or mistake negatives the state of mind required to establish an element of the offense"); *State v. Locquiao*, 100 Hawai'i 195, 208, 58 P.3d 1242, 1255 (2002) (holding that "where a defendant has adduced evidence at trial supporting an instruction on the statutory defense of ignorance or mistake of fact, the trial court must, at the defendant's request, separately instruct as to the defense"). However, whether the defense law is actually "applicable to the facts," is *contingent* on whether it is requested because it is an optional instruction based on both the facts *and* each party's trial strategy. *See supra.* These rules do not—and should not, *see infra*,—burden the trial court to *automatically* instruct the jury as to every possible defense that may be inferred from the facts or supported by a scant amount of "unsatisfactory" evidence. Instead, as suggested by *Pinero*, the defendant's legal right to a defense instruction *accrues* when the defendant, or for certain defenses the defendant or prosecution, *see supra*, requests the instruction. An instruction as to a defense is not required if the defendant or prosecution, for strategic reasons, do not request it. *See People v. Palladino*, 47 A.D.3d 491, 492, 849 N.Y.S.2d 542, 543 (N.Y.App.Div.2008) (rejecting defendant's claim that "the court should have instructed the jury, sua sponte, on the law of justification in defense of property" because "[s]uch action would have unlawfully interfered with defense strategy since 'a defendant unquestionably has the right to chart his own defense' ..., and would, in any event, have been unsupported by a reasonable view of the evidence") (internal citations omitted); *Schwindling v. State*, 269 Ark. 388, 602 S.W.2d 639, 639 (1980) ("Even assuming arguendo that the defense was sufficiently raised by the evidence, the court is not required to give a specific instruction when, as here, none was requested." (citing Ark.Code Ann. § 43–2134 (Repl.1977)); *Tyler v. State*, 265 Ark. 822, 581 S.W.2d 328 (1979); *Roberts and Charles v. State*, 254 Ark. 39, 491 S.W.2d 390 (1973)).

I am also mindful that a trial court *sua sponte* must "instruct juries as to any included offenses *having a rational basis in the evidence* without regard to whether the prosecution requests, or the defense objects to, such an instruction." [3] *State v. Haanio*, 94

> circumstances, involving both act and intent, than any single man, however pure, wise and eminent he may be.... [T]o give it full effect, the jury must be left to weigh the evidence, and to examine the alleged motives by their own tests.

24 Haw. at 207 (quoting *People v. Garbutt*, 17 Mich. 9 (1868)) (ellipses and brackets added). Far from requiring a trial court to *sua sponte* issue a defense instruction, a trial court is simply prohibited from *rejecting* a requested defense instruction for the protection of the jury and tribunal.

3. I further recognize that this court has held that the circuit court plainly erred in failing to instruct the jury that the prosecution bore the burden of negativing defendant's mistake-of-fact defense. *See State v. Eberly*, 107 Hawai'i 239, 251, 112 P.3d 725, 737 (2005) (holding that the trial court plainly erred in failing to instruct the jury that the prosecution bore the burden of negativing defendant's mistake-of-fact defense); *State v. Culkin*, 97 Hawai'i 206, 35 P.3d 233 (2001) (holding that the trial court plainly erred by issuing jury instructions that included an instruction that "self-defense 'is a defense to any and all offenses brought against the Defendant,'" but did not specifically include, as an element of reckless manslaughter, an instruction that the prosecution had the burden of proving that defendant did not act in self-defense); *State v. Maelega*, 80 Hawai'i 172, 177, 907 P.2d 758, 763 (1995) (observing that, once a defendant had asserted and adduced evidence in support of the non-affirmative mitigating defense of EMED, "[t]he [circuit] court was then required to instruct the jury that the prosecution had the burden of disproving this defense beyond a reasonable doubt"); *Raines v. State*, 79 Hawai'i 219, 225, 900 P.2d 1286, 1292 (1995) ("[W]here ... the jury has been given instructions on a defense

Hawai'i 405, 407, 16 P.3d 246, 248 (2001) (emphasis added). In *Haanio,* this court rejected the view that the parties, as a matter of trial strategy or constitutional law, have any right to forego such an instruction as to any included offense having a rational basis in the evidence. *Id.* at 414–15, 16 P.3d at 255–56. Nevertheless, the question as to whether a trial court must instruct as to every *defense,* regardless of "how weak" though not requested, and thereby affect the defendant's defense strategy, is distinct from whether the defendant can prevent the jury from considering his or her guilt on included offenses. *See Auld,* 114 Hawai'i at 149, 157 P.3d at 588 (Nakamura, J., concurring and dissenting) ("the question of whether the defendant should have a say in how to defend against the charges presented to the jury by forgoing a self-defense instruction is different from the question decided in *Haanio* of whether the defendant can prevent the jury from considering his or her guilt on lesser included offenses"); *People v. Barton,* 12 Cal.4th 186, 47 Cal.Rptr.2d 569, 906 P.2d 531 (1995). In *Barton,* a case this court cited to in *Haanio,* the Supreme Court of California considered whether the trial court may instruct on included offenses *sua sponte* if (1) the evidence supporting the lesser included offense contradicts the defendant's theory of the case and (2) the defendant requests that the court not give the instruction, when it would not be obligated to instruct as to a defense under such circumstances. 12 Cal.4th at 196, 47 Cal.Rptr.2d at 574, 906 P.2d at 536. The court rejected the defendant's request that an instruction as to a defense and an included offense be treated the same, holding instead, that a trial court's duty *sua sponte* to instruct as to lesser included offenses differs from its duty to instruct as to defenses:

> [A] trial court must, sua sponte, or on its own initiative, instruct the jury on lesser included offenses "when the evidence raises a question as to whether all of the elements of the charged offense were present, but not when there is no evidence that the offense was less than that charged."....
>
> In contrast to lesser included offenses, a trial court's duty to instruct, sua sponte, or on its own initiative, on particular defenses is more limited, arising "only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case."

12 Cal.4th at 194–95, 47 Cal.Rptr.2d at 573, 906 P.2d at 535 (citations omitted). The court explained that

> [w]hen ... the question is whether the trial court must, on its own initiative, instruct the jury on *defenses* not asserted by the defendant, different considerations arise. Failure to so instruct will not deprive the jury of the opportunity to consider the full range of criminal offenses established by the evidence. Nor is the prosecution denied the opportunity to seek conviction on all offenses included within the crime charged. Moreover, to require trial courts to ferret out all defenses that might possibly be shown by the evidence, even when inconsistent with the defendant's theory at trial, would not only place an undue burden on the trial courts but would also create a potential of prejudice to the defendant.

*Id.* at 197, 47 Cal.Rptr.2d at 574, 906 P.2d at 536. For the same reasons, even though this court has held that a trial court must instruct as to included offenses having a rational basis in the evidence, it does not follow that a

other than an affirmative defense, but has not been instructed that the prosecution bears the burden of proof beyond a reasonable doubt with respect to negativing that defense, substantial rights of the defendant may be affected and plain error may be noticed."). However, the trial court errs under such circumstances because when the jury is only partially instructed as to the defense, the instructions are misleading. *See Maelega,* 80 Hawai'i at 179, 907 P.2d at 765 (holding that the trial court's instructions were reversible because they "were prejudicially erroneous and misleading"); *Raines,* 79 Hawai'i at 224, 900 P.2d at 1291 (explaining that "there is a substantial risk that the jury may have mistakenly concluded that Raines had the burden of proving that he acted under an extreme emotional disturbance"). The circuit court has a duty to correct defective instructions and ensure that the case goes to the jury in a clear and intelligent manner. *Kupau,* 76 Hawai'i at 395, 879 P.2d at 500.

trial court must *sua sponte* issue a defense instruction that is supported by "weak" evidence.

As previously stated, in this jurisdiction, upon request, a defense instruction is required if it has "any support in the evidence," regardless of how "weak, inconclusive, or unsatisfactory the evidence may be." *See, e.g., State v. Mainaaupo,* 117 Hawai'i 235, 251, 178 P.3d 1, 17 (2008) (holding that, "[h]owever weak [defendants'] testimony may have been," the circuit court erred in declining to give defendants' requested mistake of fact instructions). I cannot conclude that the failure to instruct a jury as to every defense that is supported by merely "weak, inconclusive, or unsatisfactory" evidence violates the court's "duty" to "see to it that the case goes to the jury in a clear and intelligent manner, so that they may have a clear understanding of what it is they are to decide." *Kupau,* 76 Hawai'i at 395, 879 P.2d at 500 (citations omitted). As this court has also stated, " '[t]he standard of review for a trial court's issuance or refusal of a jury instruction is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading.' " *Mainaaupo,* 117 Hawai'i at 247, 178 P.3d at 13 (quoting *State v. Balanza,* 93 Hawai'i 279, 283, 1 P.3d 281, 285 (2000)).

Aside from my broader view that this court should hold that a party must request a defense instruction, there is additional support that a trial court is not required to issue a mistake of fact defense *sua sponte.* The trial court's duty to issue a mistake of fact defense is contingent on, in part, *"the defendant's request."* *Locquiao,* 100 Hawai'i at 208, 58 P.3d at 1255 (emphasis added). When determining whether a circuit court's error in refusing to instruct the jury on the mistake of fact defense was harmless beyond a reasonable doubt, this court decided to adopt the rule set forth by certain jurisdictions that the mistake of fact instruction is required, *"when properly raised,* in order to *draw the jury's attention to the defendant's theory of the case."* *Id.* at 206–07, 58 P.3d at 1253–54 (citations omitted) (emphases added).

Finally, if the defendant's rights were prejudiced by the trial counsel's failure to create or implement a defense strategy (that included requesting a particular defense instruction), the defendant is not without remedy. The defendant is entitled to argue in a post-conviction proceeding, that his or her trial counsel rendered ineffective assistance in failing to request a defense instruction. *See State v. Uyesugi,* 100 Hawai'i 442, 464, 60 P.3d 843, 865 (2002) (reviewing a defendant's claim that his trial counsel provided ineffective assistance of counsel for, among other things, failing to request an instruction on the law defining "appreciate"); Hawai'i Rules of Penal Procedure Rule 40 (providing in relevant part that "[w]here the petition alleges the ineffective assistance of counsel as a ground upon which the requested relief should be granted, the petitioner shall serve written notice of the hearing upon the counsel whose assistance is alleged to have been ineffective and said counsel shall have an opportunity to be heard[ ]").[4] As further discussed *infra,* it is not the *trial court's* responsibility to implement defense strategy with a defense instruction when the defense counsel fails to do so. *Cf. State v. Fox,* 70 Haw. 46, 55–56, 760 P.2d 670, 675 (1988) (stating that the adversary system "presuppose[s] ... that a party must look to his counsel to protect him and that he must bear the cost of the mistakes of his counsel" (quoting 3A Wright, Federal Practice and Procedure: Criminal 2d § 856 (1982) (footnote omitted))). Nor should it be plain error on the part of the *trial court* if it fails to instruct the jury as to this defense *sua sponte* if the defense counsel chooses not to request that it be given.

In light of the foregoing, I believe this court should hold that the trial court is not required to instruct the jury *sua sponte* as to every defense regardless of "how weak," and

4. To meet this burden, an appellant must establish " 'specific errors or omissions ... reflecting counsel's lack of skill, judgment, or diligence' and that 'these errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense.' " *State v. Uyesugi,* 100 Hawai'i at 464, 60 P.3d at 865 (quoting *Briones v. State,* 74 Haw. 442, 462, 848 P.2d 966, 976 (1993)) (ellipses in original).

that such failure is not an "instructional error" warranting appellate review under *Nichols.*

2. *Requiring the trial court to instruct as to every possible defense, regardless of "how weak," would burden the trial court and override the defense counsel's role in creating defense strategy.*

As previously stated and worth repeating again, when requested by a defendant, a defense instruction is required to be given if the evidence fairly raises the issue, regardless of "how weak, unsatisfactory, or inconclusive" the evidence may be. *State v. Irvin,* 53 Haw. 119, 120, 488 P.2d 327, 328 (1971) (quoting *Territory v. Alcantara,* 24 Haw. 197, 208 (1918)) (holding that the trial court's refusal of the defendant-requested self-defense instruction was reversible error, even where this contradicted his theory of defense at trial). Because of the low standard governing defense instructions, it would be extremely problematic to require a court to instruct the jury *sua sponte* as to all defense instructions that may possibly be implicated by the facts. This requirement would (1) burden the trial court with the duty to examine *every* possible theory that may fit the entire body of evidence before the court, (2) restructure the adversary system contrary to the interests of both the prosecution and defendant, and (3) create incentives for a defendant *not* to request a defense instruction.

First, inasmuch as the defendant need not assert the theory of defense in order to be entitled to the defense instruction, it will not always be readily apparent to a trial court which defenses are minimally supported by evidence. *See Auld,* 114 Hawai'i at 148–149, 157 P.3d at 587–88 (Nakamura, J., concurring and dissenting) ("It is not always apparent that sufficient evidence for a self-defense instruction has been introduced, especially where self-defense is not asserted as a theory of defense."); *Barton,* 12 Cal.4th at 197, 47 Cal.Rptr.2d at 574, 906 P.2d at 536 ("[T]o require trial courts to ferret out all defenses that might possibly be shown by the evidence, even when inconsistent with the defendant's theory at trial, would not only place an undue burden on the trial courts but would also create a potential of prejudice to the defendant."). If the trial court was required *sua sponte* to instruct the jury on "every defense or theory" that is possibly applicable to the defendant's case, particularly, one that is merely supported by "weak" evidence, it would be burdened with reviewing the entire body of evidence and considering every defense that may be applicable to the facts. *See Barton,* 12 Cal.4th at 197, 47 Cal.Rptr.2d at 574, 906 P.2d at 536 (" 'Appellate insistence upon *sua sponte* instructions which are inconsistent with defense trial theory or not clearly demanded by the evidence would hamper defense attorneys and put trial judges under pressure to glean legal theories and winnow the evidence for remotely tenable and sophistical instructions.' ") (quoting *People v. Sedeno,* 10 Cal.3d 703, 716–17, 112 Cal.Rptr. 1, 10, 518 P.2d 913, 921–22 (1974)).

The California courts have ruled, in recognition of this burden, that " '[a] legal concept that has been referred to only infrequently, and then with "inadequate elucidation," cannot be considered a general principle of law such that a trial court must include it within jury instructions in the absence of a request.' " *People v. Watie,* 100 Cal.App.4th 866, 882, 124 Cal.Rptr.2d 258, 269 (2002) (quoting *People v. Bacigalupo,* 1 Cal.4th 103, 126, 2 Cal.Rptr.2d 335, 345, 820 P.2d 559, 569 (1991)). In other words, the "trial court [is] under no obligation to sift through the evidence to identify [a defense] that conceivably could have been, but was not, raised by the parties, and to instruct the jury, sua sponte, on that issue." *People v. Montoya,* 7 Cal.4th 1027, 1050, 31 Cal.Rptr.2d 128, 142, 874 P.2d 903, 917 (1994). Instead, in California, "[a] trial court's duty to instruct, sua sponte, on particular defenses arises 'only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' " [5] *People v. Maury,* 30 Cal.4th

5. The Ninth Circuit Court of Appeals has reviewed whether the trial court's failure to *sua sponte* instruct the jury regarding mistake of fact was an error. *See Byrd v. Lewis,* 566 F.3d 855

342, 424, 133 Cal.Rptr.2d 561, 631, 68 P.3d 1, 60 (2003) (citations omitted) (some internal quotation marks omitted); *see also Montoya*, 7 Cal.4th at 1047, 31 Cal.Rptr.2d at 140, 874 P.2d at 915 ("It is settled that, even in the absence of a request, a trial court must instruct on general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case.") (citations omitted).

As the Court of Appeal of California reasoned in reviewing the trial court's failure to instruct *sua sponte* as to a lesser included offense,

> *[T]he trial court cannot be required to anticipate every possible theory that may fit the facts of the case before it and instruct the jury accordingly. The judge need not fill in every time a litigant or his counsel fails to discover an abstruse but possible theory of the facts* .... [The defendant's] theory ... was not one that the evidence would strongly illuminate and place before the trial court. On the contrary, it was so far under the surface of the facts and theories apparently involved as to remain hidden from even the defendant until the case reached this court on appeal. The trial court need not, therefore, have recognized it and instructed the jury in accordance with it. *Omniscience is not required of our trial courts.*

*People v. Wade*, 53 Cal.2d 322, 334–35, 1 Cal.Rptr. 683, 692, 348 P.2d 116, 125 (1959), *overruled on other grounds* in *People v. Carpenter*, 15 Cal.4th 312, 381, 63 Cal.Rptr.2d 1, 40, 935 P.2d 708, 747 (1997) (brackets and ellipses added) (emphases added). By holding that the trial court is required to instruct as to every defense *sua sponte* with even the slightest support in the evidence, trial courts would be required to be "omniscien[t]" and recognize every hidden defense available to the defense. *See Wade*, 53 Cal.2d at 334–35, 1 Cal.Rptr. at 692, 348 P.2d at 125. It would be dangerously harmful to trial courts and judicial efficiency if trial courts were to be required to instruct as to every defense *sua sponte.*

The trial court is not responsible to create or implement a defense strategy—this role is reserved for the defense counsel. *See Shells v. State*, 642 So.2d 1140, 1141 (Fla.Dist.Ct. App.1994) ("To find fundamental error in this case[, where a trial court failed to *sua sponte* give a self-defense instruction,] would place an unrealistic burden on the trial judge concerning trial tactics and strategy that *should be left to defense counsel.*" (citing *State v. Smith*, 573 So.2d 306, 310 (Fla.1990)) (emphasis added)). It is obvious that the trial court should not step into the role of advocate for the defendant over the entire course of the proceedings by considering and creating defenses and issuing defense instructions that are weakly suggested by the evidence, because this would contravene the essence of our adversarial system. As this court has stated, "[t]he very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free." *State v. Yamada*, 108 Hawai'i 474, 484, 122 P.3d 254, 264 (2005) (quoting *State v. Vliet*, 91 Hawai'i 288, 295, 983 P.2d 189, 196 (1999) (quoting *Herring v. New York*, 422 U.S. 853, 862, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975))). Inflicting defense instructions that were not requested would violate these established principles. Moreover, because the trial court would essentially serve as a quasi-agent for the defense counsel when it implements a defense through the issuance of a defense

(9th Cir.2009) (holding that trial court's failure to sua sponte give mistake-of-fact instruction was not prejudicial). However, I find this case unpersuasive, inasmuch as *Byrd* did not discuss or cite to any cases that explained why the trial court is required to *sua sponte* instruct the jury as to a defense that is legally sound. Instead, citing to *Beardslee v. Woodford*, 358 F.3d 560, 577 (9th Cir.2004) (citing *United States v. Scott*, 789 F.2d 795, 797 (9th Cir.1986)), the Ninth Circuit stated that " '[f]ailure to instruct on the defense theory of the case is reversible error if the theory is legally sound and evidence in the case makes it applicable.' " However, *Beardslee* and *Scott* did not consider the failure to instruct on a defense theory *sua sponte*. *See Beardslee*, 358 F.3d at 577 (reviewing whether the trial court's defense instruction that was issued to the jury was proper); *Scott*, 789 F.2d at 797 (considering whether the trial court properly denied a defense instruction).

instruction, it would be grossly unfair to the prosecution.

In addition, increasing the trial court's duties as to defense instructions would restrict the defendant's ability to successfully present his or her strategic defense. *Auld,* 114 Hawai'i at 148, 157 P.3d at 587 (Nakamura, J., concurring and dissenting) ("Forcing an unwanted self-defense instruction on a defendant would take control of the defense away from the defendant and impair the defendant's ability to present his or her defense."). The defense counsel may have valid strategic (though unobvious) reasons not to request a particular defense instruction. Yet, if this court were to hold that a trial court is *required sua sponte* to issue every defense instruction warranted by "any support in the evidence," these reasons would be trumped by the court's unwarranted duties. As the New York's Supreme Court, Appellate Division stated: "[A] defendant is entitled to establish his own defense, and it is impermissible for the trial court to foist upon him an affirmative defense which, while arguably supportable by the prosecution's case, is in direct conflict with the course he has charted." *People v. Maldonado,* 175 A.D.2d 698, 699, 573 N.Y.S.2d 662, 664 (N.Y.App.Div. 1991). The issuance of a *sua sponte* defense instruction, therefore, can prejudice the defendant and constitute error. *See People v. Jackson,* 77 Mich.App. 392, 258 N.W.2d 89, 91 (1977) (holding that the trial court's failure to *sua sponte* instruct on a defense was not plain error, where, among other things, the defense instruction would have contradicted the defendant's main defense).

Further, this court has held in the context of an ineffective assistance of counsel claim, that "matters presumably within the judgment of counsel, like *trial strategy,* will rarely be second-guessed by judicial hindsight." *State v. Richie,* 88 Hawai'i 19, 39–40, 960 P.2d 1227, 1247–48 (1998) (quoting *State v. Smith,* 68 Haw. 304, 311, 712 P.2d 496, 501 (1986)) (ellipses added, internal quotation marks omitted). Moreover, "[s]pecific actions or omissions alleged to be error but which had an obvious tactical basis for *benefitting* the defendant's case will not be subject to further scrutiny." *State v. De Guair,* 108 Hawai'i 179, 187, 118 P.3d 662, 670 (2005) (quoting *Briones v. State,* 74 Haw. 442, 462–63, 848 P.2d 966, 976 (1993) (emphases in original)). Other courts have similarly held that "counsel's strategic choice to pursue one line [of defense] to the exclusion of others is rarely second-guessed on appeal." *United States v. Balzano,* 916 F.2d 1273, 1294 (7th Cir.1990) (citations omitted, formatting altered, brackets added); *United States v. Adamo,* 882 F.2d 1218, 1227 (7th Cir.1989); *Quilling v. United States,* 243 F.Supp.2d 872, 884 (S.D.Ill.2002). Requiring the trial court *sua sponte* to instruct the jury on every defense will result in that court actively second-guessing the defendant's strategies.

Finally, demanding that a trial court issue every defense instruction whenever slight evidence warrants it would encourage defense counsel *not* to request defense instructions, in order to receive an automatic retrial. *Auld,* 114 Hawai'i at 149, 157 P.3d at 588 (Nakamura, J., concurring and dissenting). Because the standard for a defense instruction is set so low, the defendant can easily argue on appeal that the circuit court committed reversible error in failing *sua sponte* to issue every defense instruction regardless of "how weak." Moreover, in order to prevent the defendant from profiting from his or her *own counsel's decision* not to request a defense instruction, the prosecution would then be coerced to request the court to instruct the jury as to a *defense.*

If the defense is truly a part of defense strategy, it should be requested by defense counsel. It is not the responsibility of the prosecution or the trial court to ensure that the jury is instructed as to every possible defense.

With all due respect, in my view this court should overturn *Auld* and hold that the right to the mistake of fact instruction accrues *after* the defendant or prosecution requests the defense instruction, and therefore, a trial court is not required *sua sponte* to instruct the jury as to this defense. Moreover, for the reasons expressed above, a trial court should not be required *sua sponte* to issue every defense instruction that is merely supported by "weak" evidence. Accordingly, in light of the foregoing, I cannot conclude that the circuit court committed prejudicial error

when it failed to instruct the jury on the defense of mistake of fact *sua sponte.*

**B. Error, If Any, In Failing To Instruct the Jury *Sua Sponte* On the Mistake Of Fact Defense Was Harmless.**

Even assuming that the circuit court was required to instruct the jury *sua sponte* on the mistake of fact defense, I also respectfully dissent from the majority's holding that the trial court's failure to give the mistake of fact instruction was not harmless.[6] The majority holds that "it cannot be concluded that the court's failure to instruct on the defense of mistake of fact was harmless beyond a reasonable doubt" because "there is a reasonable possibility that the jury, if provided with a separate mistake of fact instruction, could have found that Petitioner believed that she complied with the reporting requirements, and thus, did not knowingly deceive DHS." Majority opinion at 282–83, 226 P.3d at 452–53. I respectfully dissent from this part of the majority's opinion, because, in my view, there was overwhelming evidence negating Stenger's potential mistake of fact defense. Therefore, any error in failing to give a mistake of fact instruction was harmless beyond a reasonable doubt.

The standard for whether the failure to give a jury instruction is harmless is "whether there is a reasonable possibility that error might have contributed to conviction." *State v. Nichols,* 111 Hawai'i 327, 334, 141 P.3d 974, 981 (2006) (quoting *State v. Gonsalves,* 108 Hawai'i 289, 292–93, 119 P.3d 597, 600–01 (2005)). In evaluating whether there is a reasonable possibility that the error contributed to the conviction, the error "must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled." *Id.* Erroneous "instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial." *State v. Locquiao,* 100 Hawai'i 195, 203, 58 P.3d 1242, 1250 (2002) (quoting *State v. Valentine,* 93 Hawai'i 199, 203, 998 P.2d 479, 483 (2000)).

In this case, the trial court's error, if any, was its failure to instruct the jury on the mistake of fact defense. This error is harmless if there is no reasonable possibility that the court's failure to separately instruct the jury on the mistake of fact defense contributed to the conviction. Stenger claims, and the majority holds, that the trial court's failure to separately instruct the jury on the mistake of fact instruction prejudiced her because Stenger "provided some basis for the jury to believe (1) that she was mistaken as to the reporting requirements, *i.e.,* that she believed the reporting she provided was sufficient to receive assistance, and/or, (2) that Petitioner was mistaken as to certain factual matters regarding her personal situation which caused her to misreport, *i.e.,* that Keana had not in fact moved out of her home permanently." Majority Opinion at 282, 226 P.3d at 452. I respectfully dissent from this part of the majority's opinion because I do not believe that a jury could possibly have found that Stenger was mistaken as to the reporting requirements or mistaken as to her family situation for two reasons.

1. *There is overwhelming evidence that Stenger knew the reporting requirements.*

There was overwhelming evidence negating Stenger's mistake of fact defense, and therefore, it is not reasonably possible that a

6. For the same reason, even if trial courts have a duty to instruct the jury *sua sponte* on defenses supported by "substantial evidence," the circuit court's duty was not triggered in this case. For instance, California courts have required trial courts to instruct the jury *sua sponte* on a defense "only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." *People v. Barton,* 12 Cal.4th 186, 195, 47 Cal.Rptr.2d 569, 573, 906 P.2d 531, 535 (1995) (emphasis added) (citations omitted) (quoting *People v. Sedeno,* 10 Cal.3d 703, 716, 112 Cal.Rptr. 1, 9–10, 518 P.2d 913, 921 (1974)); *People v. Burnham,* 176 Cal.App.3d 1134, 1140 n. 3, 222 Cal.Rptr. 630, 635 n. 3 (1986) (holding that a defendant must produce substantial evidence supporting a defense before a trial court is required to issue a *sua sponte* instruction on the defense). In my view, trial courts do not have a duty to issue *sua sponte* defense instructions. *See supra* at 300–305, 226 P.3d at 470–75. However, even if trial courts must instruct the jury *sua sponte* on defenses supported by substantial evidence, the circuit court did not breach this duty because Stenger did not adduce substantial evidence in support of her mistake of fact defense.

jury would have found that Stenger thought she had correctly reported information to DHS. For instance, the application for Financial and Food Stamps Assistance that Stenger submitted to DHS specifically stated:

> **(3) YOUR RESPONSIBILITIES:**
>
> REPORT ANY CHANGES IN YOUR HOUSEHOLD OR FAMILY WITHIN 10 DAYS OF THE TIME YOU LEARN OF THE CHANGE. If you are only receiving Food Stamps and you are required to submit a Monthly Eligibility Report Form (MERF), you must report all changes on the MERF.

The application provides examples of changes that Stenger needed to report. Two of the examples are "lump sum" payments and "Receipt, increase, decrease or termination of money from any source." The application uses "Earnings" and "Inheritance" as examples of income that Stenger needed to report. Thus, the application that Stenger completed informed her of her obligation to report all changes in her income.

Furthermore, the Monthly Eligibility Report Forms ("MERF") that Stenger filled out contained similar warnings. For instance, the MERFs stated that:

> **NOTE: IF YOU ARE RECEIVING FINANCIAL ASSISTANCE, YOU MUST REPORT ALL CHANGES WITHIN 10 DAYS THAT THE CHANGE BECOMES KNOWN TO YOU.**

The MERFs also ask three pertinent questions. First, the MERFs ask whether "anyone in your household receive[d] income[.]" Second, the MERFs ask whether there has "been a change in your households [sic] total assets (bank accounts, checking/savings accounts ... )[.]" Finally, the MERFs ask whether "anyone [has] moved in or out of your household[.]" The MERFs warned Stenger that if "you are not truthful, or if you do not report changes within 10 days of the time you learn of the change, the Department can take back any money overpaid to you, and you may be taken to court." Stenger submitted ten MERFs containing these warnings. Thus, the MERFs also warned Stenger that she needed to report *all* changes in her income and household.

Additionally, Terri Cambra, an eligibility supervisor for DHS, testified that she interviewed Stenger when Stenger applied for financial assistance and told Stenger of her obligation report all changes in her financial situation or household composition within ten days. Cambra testified:

> Q. Now, as part of the interview, did you also go over her responsibilities and the penalties for failing to abide by those responsibilities?
>
> A. *Yes. As I said, on the last two pages of the application itself is a complete listing of rights and responsibilities to report changes. And we do review that with each interview in detail almost line for line and confirm that their signature certifies that they understood this is their rights and responsibilities.* These are the type of changes to report. These are the penalties for giving false information or doing anything dishonest in order to get the benefits.
>
> Q. All right. And did you advise her that she must report any changes either in her household composition or financial situation within ten days?
>
> A. Yes....

Following Cambra's explanation of the rights and responsibilities of accepting financial assistance, Stenger signed her application which certified that she had "been informed of [her] rights and responsibilities by [Cambra] and [agreed] to heed these responsibilities."

Stenger knew she needed to report all changes in her income and family composition within ten days to DHS because the applications, MERFs, and Cambra told her.

Thus, although the majority holds that it is possible that Stenger thought she correctly reported her information to DHS, overwhelming evidence supports the conclusion that Stenger knew she was required to report all changes in her income and household on her MERF forms, and failed to do so.

2. *There is no reasonable possibility that a jury would have found that Stenger's testimony negated the overwhelming evidence against her mistake of fact defense.*

The evidence Stenger produced for her mistake of fact defense was weak in compari-

son to the overwhelming evidence negating her defense. Stenger essentially makes four arguments supporting her mistake of fact defense: (1) that she provided timely notice that Kaelin moved out of the house and thought Keana was returning in a "few weeks[;]" (2) that she did not work at the Hawai'i Surf Academy ("HSA") because it was "seasonal[;]" (3) that she failed to attach her Department of Education ("DOE") pay stubs to her MERFs because she was not working regularly, and (4) that she "did not report the $5000 check that was dated in April 2003, but submitted a written request in May 2003 that she be removed from public assistance." These contentions do not negate the overwhelming evidence that Stenger knew the proper reporting requirements and failed to report properly to obtain more benefits from DHS.

First, Stenger's assertion that she thought Keana was moving back with Stenger in a "few weeks" does not negate her obligation to report that information to DHS within ten days. Luisa Himphill, Eric Himphill's mother, testified that Eric Himphill obtained physical custody of Keana in January 2003, and that she took Keana from Stenger on the same day. Stenger did not report that Keana had moved out of her household until she submitted her MERF on May 7, 2003. Outside of her own testimony, there is no evidence in the record supporting Stenger's argument that she believed it was acceptable not to report Keana had moved out of her home until three months had passed. Rather, as discussed above, her MERFs, application, and interview with Cambra, told her that she needed to report all changes in her household to DHS within ten days. She failed to do this. Thus, I do not believe a separate mistake of fact instruction could possibly have affected Stenger's conviction.

Second, Stenger's assertion that she mistakenly thought she accurately reported her DOE income is also unconvincing. The State and Stenger stipulated that she received income from the DOE on March 20, April 4, April 17, May 5, and May 20 of 2003. None of this income was reported on Stenger's MERFs. Stenger asserts that she did not report her income on her MERFs because the income was not "regular." However, as discussed above, the applications and MERFs Stenger completed informed her of her obligation to report all changes in income. The MERFs further required Stenger to attach pay stubs. Thus, outside of her testimony, there is no support for Stenger's assertion that she believed that it was acceptable to omit reporting income because it was not "regular."

Stenger also asserts that she "had reported to DHS that she started working" at the DOE by writing Lyn Cardenas ("Cardenas"), a DHS eligibility worker, a letter on February 28, 2003. The letter Stenger wrote to Cardenas stated:

> Mrs. Cardenas,
>
> I started working and need to get my child care taken care of for Jadelyn + Jolene, do I need 2 applications for child care? Please call . . . + leave message[.]

Stenger asserts that this letter shows she believed she properly reported her DOE income. However, Cardenas testified she called Stenger and Stenger told her that the DOE employment was "on call" and the DOE had not yet called her. Additionally, Cardenas testified:

> Q. But if she was called, you would have expected some sort of indication of that in one of the MERFs, maybe a call in some other kind of way?
>
> A. Yes. *And even on the MERFs, it asked did you receive any income? And the one dated for February that was dated for March the 3rd, she indicated no. And then the March MERF that was dated April 1st, she also said no on top of it.*

Cardenas also testified that Stenger was required to submit pay stubs with her MERFs. Thus, it is not reasonably possible that Stenger believed her one-sentence letter satisfied her reporting requirement, which included attaching pay stubs to her MERFs and notifying DHS of any changes in income within ten days. Therefore, any failure to separately instruct the jury on Stenger's mistake of fact defense did not contribute to her conviction.

Third, Stenger was the sole signatory on HSA's bank account, and the account history

reflects that Stenger received income from her HSA business between July 2002 (when Stenger applied for financial assistance) and May 2003 (when she requested to stop receiving assistance). Majority Opinion at 275–76, 226 P.3d at 445–46. Stenger testified that she did not work at HSA because it was "seasonal" and she "previously reported the business to DHS." In my view, these arguments are unpersuasive because Stenger knew she needed to report new income to DHS. The applications and MERFs do not list "seasonality" as an exception to reporting income. Cardenas testified that:

> Q. [W]ith the business, Hawai'i Surf Academy, if she had received income from that business, what would you have expected to see?
>
> A. I would have expected to see the pay stubs or verification of her income.
>
> Q. And was there any kind of verification like what you described submitted by Angela Stenger?
>
> A. No, there was none.

The applications and MERFs also make it clear that Stenger was required to report all income she received to DHS. Stenger failed to do this. Thus, it is not reasonably possible that a jury, if given a separate instruction on mistake of fact, would have found that Stenger did not know she was required to report her income from HSA.

Finally, Stenger asserts that she "did not report the $5,000 check that was dated in April 2003, but submitted a written request in May 2003 that she be removed from public assistance." In my view, Stenger's argument is unpersuasive because there is no reasonable possibility that a jury could have concluded that Stenger mistakenly believed her letter complied with the reporting requirements. Stenger never testified that she thought her letter properly reported her income from the $5,000 check. Furthermore, she filed a MERF on May 7, 2003, stating that she had not received any income in the month of April and that her household's total assets had not changed. Finally, despite Cambra's testimony that she told Stenger of her obligation to report changes in income to DHS, Cardenas testified that Stenger did not report any of the $5,000 to DHS. In light of the overwhelming evidence that Stenger knew the proper reporting requirements and her failure to testify that she mistakenly believed that her request to no longer receive assistance was tantamount to properly reporting, any error by the trial court in failing to *sua sponte* instruct the jury on the mistake of fact defense was harmless with respect to the $5,000 check Stenger received.

In conclusion, the trial court's failure to instruct *sua sponte* on the mistake of fact defense was harmless because it was not reasonably possible that the issuance of a separate mistake of fact instruction could have supported a finding that Stenger did not knowingly deceive DHS. Therefore, error, if any, in failing to instruct the jury on the mistake of fact defense *sua sponte* was harmless. For the foregoing reasons, I respectfully dissent.